(No. 70887.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. PATRICK PAGE, Appellant.

*Opinion filed April 15, 1993.—Rehearing
denied June 28, 1993.*

238

HARRISON, J., took no part.

Charles M. Schiedel, Deputy Defender, of Springfield, and Steven Clark, Assistant Appellate Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE MILLER delivered the opinion of the court:

The defendant, Patrick Page, was convicted of murder, armed robbery, and home invasion in a jury trial in the circuit court of Cook County. At a separate sentencing hearing, the same jury found the defendant eligible for the death penalty and concluded that were no mitigating circumstances sufficient to preclude its imposition. The trial judge therefore sentenced the defendant to death for the murder conviction; the judge imposed concurrent 60-year terms of imprisonment for the defendant's remaining convictions. The defendant's death sentence has been stayed pending direct review by this court. (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rules 603, 609(a).) For the reasons that follow, we affirm the judgment of the circuit court.

Page and a codefendant, Gerald Feinberg, were jointly indicted for the present offenses. Their cases were severed, and Feinberg later pleaded guilty to mur-

der and was sentenced to a term of natural life imprisonment for the offense. The present appeal involves only defendant Page's convictions and sentences.

The victim in this case, John Goodman, was an attorney employed by a large corporation. Goodman lived alone in Olympia Fields and was acquainted with the defendant and Feinberg. At the defendant's trial, James Reveliotis, manager of a Toyota dealership where Goodman had purchased cars, testified that on Thursday, May 7, 1987, he went to Goodman's house in Olympia Fields around 5:30 p.m. to pick up one of Goodman's cars. Reveliotis, who had known Goodman since 1984, was going to take the car to a shop for some paint work. When Reveliotis arrived at the house, he found two other men with Goodman; Reveliotis identified the defendant as one of the men. When Reveliotis requested the keys to the car, Goodman asked Reveliotis why he was not dressed for dinner. Reveliotis did not understand the question—apparently they had no dinner plans—but said that he would be back in an hour. Reveliotis then took the keys from Goodman and left. According to Reveliotis, Goodman seemed nervous and uneasy.

Reveliotis returned to Goodman's house shortly. At that time, the man who had been with the defendant came out of the house and said that Goodman did not want to go to dinner; the man also asked for the keys to Goodman's car. Reveliotis replied that he wanted to give the keys to Goodman in person. The man then said that Goodman was not home and invited Reveliotis inside. Reveliotis left without entering the house. Reveliotis drove to a friend's house in Chicago Heights and told the friend, Glen Rogers, about what he had observed. Reveliotis asked Rogers to call Goodman. After making the call, Rogers told Reveliotis that he knew the two men at Goodman's house and that everything was all right.

Glen Rogers also testified at trial. Rogers had known John Goodman since 1981 and also knew both the defendant and Feinberg. Rogers testified that when he called Goodman's house during the evening of May 7, the call was answered by Gerald Feinberg, whose voice Rogers recognized. Feinberg said that Goodman and the defendant had gone out to buy some beer. Rogers testified that Feinberg called him later that night and told him that the defendant and Goodman had gone downtown. Rogers called Goodman's house several times that weekend, but no one answered. Rogers and a friend went over to Goodman's house the following Monday, May 11. They looked in the windows of the house and noticed that a television set and stereo equipment were missing. They then called the Olympia Fields police department.

Police officers entered Goodman's house later that day. A number of rooms were in disarray, and several things apparently had been removed from the premises. Investigators called to the scene discovered what appeared to be spatters of blood in a bathroom and in several other areas of the house. Latent fingerprints were lifted from various items in the house; it was subsequently determined that the defendant's fingerprints matched latent prints left on a beer can and a glass. Several days later, officers located Goodman's Toyota at the University Park commuter station. A pool of blood was found in the trunk of the car.

The defendant was arrested at his home in Park Forest on May 16, 1987. Over the next several days, the defendant gave law enforcement authorities a number of statements admitting his involvement in the present offenses. On two occasions during that time, the defendant led Olympia Fields police officers on unsuccessful searches of the area in southeastern Wisconsin where the defendant said Goodman's body had been buried. In

his formal statement, the defendant explained that on May 6, 1987, he and Jerry Feinberg discussed robbing and killing John Goodman. The defendant said that he originated the plan because he held a grudge against Goodman. The defendant and Feinberg went to Goodman's house late the next afternoon. After a friend of Goodman left, the defendant displayed a knife to Feinberg. The defendant then approached Goodman, who was in a bathroom at the time. The defendant asked Goodman about some photographs that Goodman had taken of the defendant. According to the defendant, Goodman began to laugh, and the defendant then stabbed him in the chest four times. The defendant said that the victim had not touched him prior to that.

The defendant stated that he and Feinberg then put Goodman's body in the bathtub and left it there for half an hour to an hour. After taking credit cards and money from Goodman's wallet, they wrapped the body in a sheet and a rug and placed it in the trunk of Goodman's Toyota. The defendant and Feinberg left in Goodman's car an hour later, taking with them a shovel and a can of gasoline. After stopping to eat and shoot pool in a tavern in southeastern Wisconsin, they drove to a rural area and buried the victim's body. They then burned the sheet and rug on top of the gravesite.

In his confession, the defendant also stated that on Saturday, May 9, he and a friend, Michael Naszkiewicz, transported some pieces of electronic equipment from Goodman's house to the defendant's father's home in Chicago. In addition, the defendant described his and his friends' use of Goodman's credit cards during that weekend. The defendant said that he and Feinberg abandoned Goodman's car at the University Park commuter station the following Tuesday or Wednesday.

Michael Naszkiewicz and Michelle Kury, the defendant's former girlfriend, also testified at trial.

Naszkiewicz corroborated the defendant's account of the trip to Chicago, when the electronic equipment was taken to the defendant's father's home. Naszkiewicz also stated that during the afternoon of Tuesday, May 12, he followed the defendant and Feinberg to the train station in University Park, where they left the Toyota.

Kury, in her testimony, stated that the defendant and Jerry° Feinberg appeared at her house on Friday evening, May 8, 1987, in a maroon Toyota she had never seen before. They were also wearing clothing she had not previously seen. The defendant and Feinberg gave various explanations of how they had obtained the car. They eventually said that John Goodman was on vacation and that they were watching his house; they also explained that they had found a number of credit cards in Goodman's car. That weekend, the defendant, Feinberg, Kury, and two other friends used the murder victim's credit cards to make a number of purchases. According to Kury, the defendant and Feinberg later destroyed the credit cards.

The victim's body was discovered in a rural area of Waukesha County, Wisconsin, on June 25, 1987. Dental records were used to confirm the identification. The autopsy revealed that the victim had sustained nine stabbing wounds to the chest; four of the wounds had entered the victim's heart and caused his death.

The defendant did not present any evidence at trial. The jury found the defendant guilty of murder, armed robbery, and home invasion. On the State's motion, the matter then proceeded to a capital sentencing hearing, which was conducted before the same jury. At the first stage of the hearing, the State presented evidence of the defendant's conviction in 1988 in Will County for the murder of Andrew Devine. The State introduced the defendant's confession to that offense, as well as the report of the autopsy conducted in that case. According to

the defendant's statement, the apparent motive for the killing was that Devine had cheated a friend, Kenneth Chaney, in a drug deal. In the statement, the defendant said that he, Feinberg, and Chaney bound Devine with a cord and injected him with barbiturates at the defendant's house in Park Forest. Later, they drove Devine to a rural area in Will County. There, Chaney first attempted to kill Devine by injecting air into his bloodstream. When that failed to kill Devine, Chaney slit his throat with a knife. The defendant and Feinberg then stabbed the victim. The defendant said that the murder occurred sometime during 1985.

The jury found the defendant eligible for the death penalty on the following grounds: commission of murder in the course of armed robbery, commission of murder in the course of home invasion, and multiple convictions for murder. (See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3) (multiple murders); par. 9—1(b)(6) (murder in the course of specified felonies).) It was also established that the defendant was born in February 1964 and thus was 23 years old at the time of the present murder.

During the second stage of the sentencing hearing, the State introduced further evidence of the defendant's criminal history. This included testimony describing the defendant's confession to the murder in 1985 of Charles Howell, in Cook County. According to the defendant's statement, which was introduced into evidence, the defendant and Feinberg killed Howell in the fall of 1985 because they were afraid he would find out about Devine's murder. In his confession, the defendant related that he and Feinberg dug a grave in a forest preserve in advance, and that they later returned to that place with Howell. There, the defendant stabbed Howell in the chest. Howell tried to run, and Feinberg picked up a piece of wood the size of a baseball bat and beat Howell on the head with it. When Howell was dead, the defend-

ant and Feinberg buried his body in the grave they had prepared earlier.

Dr. Robert Stein, chief medical examiner of Cook County, testified that he performed an autopsy on the remains of Charles Howell on July 2, 1987; the body had been discovered in a makeshift grave the previous day. An examination of the decedent's clothing revealed that the victim had been stabbed numerous times. Dr. Stein was unable to determine how long the body had been buried.

Captain Robert Maeyama of the Park Forest police department testified to various contacts he had had with the defendant while the defendant was a juvenile. Captain Maeyama stated that he apprehended the defendant in connection with eight different charges during a period from June 1977 to October 1980. These incidents included three batteries or aggravated batteries, two burglaries, a theft, an automobile theft, and a disorderly conduct.

The State also introduced certified copies of the defendant's conviction following a guilty plea on May 11, 1982, to seven charges of burglary. The defendant was sentenced to five years' imprisonment for the offenses. After the defendant had served a portion of his prison sentence on the burglary convictions, he was assigned to a prerelease center operated by the Salvation Army. Residents were allowed to leave the center during the day to work, but were required to return each night. Debbie Felt, a supervisor of the center, testified that the defendant signed out on the morning of December 5, 1983, and did not come back until January 2, 1984. As a consequence, the defendant was returned to the custody of the Illinois Department of Corrections.

Thomas Cosgrove, a case work supervisor at Logan Correctional Center, testified that the defendant was incarcerated at Logan beginning in September 1982. He

remained there until May 1983, when he was assigned to the prerelease center. The defendant was returned to Logan in February 1984 and was released on parole two months later, in April 1984. Cosgrove stated that the defendant received a total of 27 disciplinary tickets while an inmate at Logan.

The defendant presented a number of witnesses in mitigation. Arlene Messner-Peters, a social worker employed by a private firm, had prepared a mitigation report at the request of defense counsel. In the course of that assignment, Messner-Peters interviewed the defendant's family members, reviewed material from the Department of Corrections, and reviewed confessions made by the defendant. Messner-Peters testified that the defendant's childhood was unstable and that he had experienced great difficulty in school. Messner-Peters also stated that a congenital condition affecting the defendant's eye muscles had caused his eyes to roll, which had drawn taunts from other children.

Gerard Girdaukas, a licensed clinical psychologist employed by the same firm as Messner-Peters, also testified in the defendant's behalf. Tests administered by Dr. Girdaukas to the defendant revealed that the defendant had significant learning disabilities. Dr. Girdaukas also found some evidence of organic brain impairment. Dr. Girdaukas believed that the defendant was depressed and was suffering from a nonspecific personality disorder. According to Dr. Girdaukas, the defendant was under the influence of extreme emotional disturbance at the time of his commission of the present murder.

Favorable testimony was also provided by the defendant's parents, Paul and Patricia Page, and by his sister, Grace Page. The defendant's parents separated when the defendant was eight years old, and later they were divorced. The defendant lived with each parent at various times in his childhood. A neighbor also provided fa-

vorable testimony about the defendant. Finally, a clergy-man who had visited the defendant while he was an inmate of the Cook County jail testified to the defendant's interest in religion.

At the conclusion of the second stage of the sentencing hearing, the jury determined that there were no mitigating circumstances sufficient to preclude a sentence of death. The trial judge accordingly sentenced the defendant to death for the murder conviction. Later, at a separate hearing, the judge sentenced the defendant to concurrent 60-year terms of imprisonment for his convictions for armed robbery and home invasion. In the present appeal, the defendant raises a number of challenges to his convictions and death sentence.

## I. Trial Issues

The defendant first argues that the trial judge erred in declining to hold a hearing on a defense motion seeking suppression of statements made by the defendant concerning the offenses charged here. The trial judge believed that the issues raised in the motion had already been determined adversely to the defendant in an earlier proceeding in Will County, and therefore the judge concluded that a separate hearing was not necessary in this case.

The defendant was arrested around 10 p.m. on Saturday, May 16, 1987, and remained in police custody, in Cook County, until May 20, when he was taken before a judge for a bond hearing. The defendant gave law enforcement officers a number of statements with respect to the Goodman murder on May 16, 17, and 18, and early in the morning on May 19. During the afternoon of May 19, the defendant gave authorities formal statements with respect to two other cases: the murder of Andrew Devine, committed in Will County, and the murder of Charles Howell, committed in Cook County. The

first of the three cases to go to trial was the Will County prosecution for Devine's murder, and in that proceeding the defendant moved to suppress his custodial statements; as we explain below, the Will County motion did not specify which statements were being challenged by the defendant. Following a lengthy, six-day hearing, at which the parties introduced extensive testimony covering the entire period of time the defendant spent in custody, and concerning the circumstances of all the statements made by the defendant while in custody, the Will County judge denied the defendant's suppression motion. The defendant was later convicted of murder, robbery, felony murder, and aggravated kidnapping, and he was sentenced to 60 years' imprisonment for the murder conviction and to a concurrent 7-year term for the robbery conviction. The appellate court reversed the defendant's conviction for robbery but otherwise affirmed the circuit court judgment; in the appeal, the defendant raised no challenge to the ruling on the suppression motion. *People v. Page* (1990), 196 Ill. App. 3d 285.

In the case at bar, involving the Cook County prosecution for the murder of John Goodman, the defendant also moved to suppress the statements he made while in custody. The State moved to strike the defendant's motion, arguing that the same issues had already been determined in the earlier proceeding in Will County. After reviewing the transcripts of the Will County suppression hearing, the trial judge granted the State's motion to strike. The judge agreed with the prosecution that the Will County court had already resolved the admissibility of the defendant's statements regarding the Goodman murder and that the defendant therefore was collaterally estopped from challenging that determination. Citing *People v. Braden* (1966), 34 Ill. 2d 516, the trial judge stated, however, that his ruling was only interlocutory and that it could be changed prior to final judgment. The

judge later reaffirmed his initial ruling when he denied a defense motion to reopen the suppression question. We note that the trial judge, for the same reasons, granted the State's request to strike the defendant's separate motion to quash his arrest and suppress evidence; a similar motion had previously been denied in the Will County case, and the trial judge in the case at bar again concluded that the defendant was estopped from challenging the prior determination. The trial judge's disposition of that separate motion is not at issue here.

The defendant has no quarrel with the proposition that an accused may, in appropriate circumstances, be collaterally estopped from relitigating the ruling on a suppression motion. In oral argument before this court, the defendant agreed that collateral estoppel would bar relitigation of the suppression question in the present case if the Will County hearing had actually determined that all the defendant's statements were admissible, and if the defense had no additional evidence to offer in support of the present motion. The defendant contends, however, that the Will County hearing did not determine the admissibility of the statements he made with respect to the offenses charged here. In addition, the defendant maintains that he raised new allegations, and offered further evidence, in support of his motion in the proceedings below, and the defendant therefore believes that the Cook County judge should have conducted a separate hearing to consider the previously undetermined matters.

The doctrine of collateral estoppel, also referred to as estoppel by verdict, or issue preclusion, bars the relitigation in a new cause of action of an issue already determined in a prior cause of action. The party to be precluded must have been a party to the prior action, or in privity with a prior party. *Housing Authority v. Young Men's Christian Association* (1984), 101 Ill. 2d 246, 252;

*Illinois State Chamber of Commerce v. Pollution Control Board* (1979), 78 Ill. 2d 1, 7.

Although more commonly used in civil actions, collateral estoppel has been invoked in a variety of contexts in criminal cases. (See, *e.g., Ashe v. Swenson* (1970), 397 U.S. 436, 25 L. Ed. 2d 469, 90 S. Ct. 1189; *Hernandez-Uribe v. United States* (8th Cir. 1975), 515 F.2d 20; *Pena-Cabanillas v. United States* (9th Cir. 1968), 394 F.2d 785; *People v. Owens* (1984), 102 Ill. 2d 145; *People v. Mordican* (1976), 64 Ill. 2d 257.) To be sure, in the criminal matters in which the doctrine finds application, it is more frequently asserted by the defendant than against the defendant, as here. Indeed, special concerns may limit its use by the prosecution in criminal proceedings. (See *Simpson v. Florida* (1971), 403 U.S. 384, 385-87, 29 L. Ed. 2d 549, 552-53, 91 S. Ct. 1801, 1802-03 (*per curiam*); *People v. Hopkins* (1972), 52 Ill. 2d 1, 4.) For example, it has been suggested that using the doctrine in successive criminal prosecutions to establish an element of an offense impermissibly trenches on a defendant's sixth amendment right to a jury trial. See Comment, *The Use of Collateral Estoppel Against the Accused,* 69 Colum. L. Rev. 515, 521-24 (1969). But see Vestal, *Issue Preclusion and Criminal Prosecutions,* 65 Iowa L. Rev. 281, 319-21 (1980) (arguing that no constitutional deprivation occurs because defendant has already had opportunity to submit matter to trial).

These concerns are not present in this case, however, and we express no view on the use of collateral estoppel with respect to issues bearing directly on the determination of a defendant's guilt. Application of the doctrine in the circumstances before us would not strip the defendant of his presumption of innocence or deny him his right to try an issue to a jury: the voluntariness of a confession is to be determined by the trial judge alone, and not by a jury. (*Jackson v. Denno* (1964), 378 U.S. 368, 12

L. Ed. 2d 908, 84 S. Ct. 1774; Ill. Rev. Stat. 1985, ch. 38, par. 114—11(f).) We note, moreover, that application of collateral estoppel in the suppression context advances many of the same policy goals that underlie the doctrine generally, such as the conservation of judicial resources and the avoidance of repetitive litigation. For these reasons, the doctrine is properly invoked by the prosecution against the accused in the context of a suppression motion. (See Vestal, *Issue Preclusion and Criminal Prosecutions*, 65 Iowa L. Rev. 281, 318-19 (1980).) We believe that the requirements for application of the doctrine have been satisfied in the present case.

In opposing the use of collateral estoppel in the case at bar, the defendant's primary contention is that the Will County hearing did not determine an issue that would control the admissibility of the statements made by the defendant with regard to the offenses charged here, involving the victim John Goodman. It is not essential to collateral estoppel, however, that the judge or jury in the prior case have expressly stated that it was determining an issue governing the admissibility of all the different statements. It is enough for application of the doctrine if the record from the earlier proceeding discloses that the issue was actually litigated and determined, and in that event the doctrine will bar its relitigation in later proceedings. See generally Vestal, *Issue Preclusion and Criminal Prosecutions*, 65 Iowa L. Rev. 281, 291-94 (1980) (discussing identification of issue determined in prior proceeding).

Supplementing the record in the present appeal is the complete record of the Will County prosecution, including the transcript of the suppression hearing conducted in that case. From a review of the Will County record and the record in the present case, we conclude that issues pertinent to the admissibility of the defendant's statements concerning the Goodman murder were re-

solved in the earlier proceeding and that the defendant has not presented any grounds that would now require a separate suppression hearing with respect to those statements. For these reasons, we do not believe that the Cook County judge erred in refusing to conduct a hearing on the suppression motion filed by the defendant in the case at bar.

In the suppression motion filed in the Will County case, the defendant sought to suppress the statements he had made while in police custody; the suppression motion did not specify which particular sets of statements were being challenged, or indicate that the motion was limited in scope to the statements concerning the Devine murder, for which the defendant was then standing trial. In his original motion, the defendant alleged that his free will was overcome by unfulfilled promises of leniency made by the interrogating officers, that his wishes to consult with counsel and to have an attorney present were overcome by the officers' tactics, and that he had believed that the only court proceedings in which his statements would be used would be those in which the promises of leniency would be enforced. Following the conclusion of the suppression hearing, the defendant filed an amended motion, to conform more closely to the proof adduced at the hearing. Besides the allegations already mentioned, the amended motion alleged that the interrogating officers refused to honor his requests to consult with an attorney and that the officers threatened to charge his father with the offenses in the Goodman case.

At the Will County suppression hearing, the State presented the testimony of three members of the Olympia Fields police department, the assistant State's Attorney who had questioned the defendant in all three cases, and the court reporter who had transcribed the defendant's formal statements to the Devine and Howell mur-

ders. The court reporter who transcribed the defendant's formal statement in the Goodman case did not testify at the suppression hearing, and there is no explanation in the record for the person's absence. The State's witnesses testified that the defendant was given *Miranda* warnings prior to each session of questioning, that on each occasion the defendant waived the *Miranda* rights, and that the defendant was not mistreated while in custody. In addition, the witnesses denied that any promises of leniency were made to the defendant or that he or his family members were threatened in any way.

The defendant also testified at the Will County suppression hearing. The defendant stated that shortly after he was taken into custody, the police showed him a booking photograph of his father and told him that his father would be charged in the Goodman case if he did not provide a confession. The evidence discloses that the defendant's father was arrested after police learned that property belonging to John Goodman had been left at the father's house; the defendant's father was released soon after the defendant was arrested. At the hearing, the defendant also testified that the police refused to permit him to contact an attorney or family member. The defendant further alleged that prior to making the statements during the afternoon of May 19 in the Devine and Howell cases, the assistant State's Attorney who was conducting the questioning promised that the defendant would receive only a 20-year sentence for those offenses if he confessed to the crimes, and that each minute he delayed making his confession would increase his eventual sentence by a year.

Also testifying in behalf of the defendant were his mother, Patricia Page, and his sister, Grace Page. They stated that during the weekend of the defendant's arrest, they repeatedly called the Olympia Fields police station and asked to speak to the defendant; according

to the witnesses, their requests were refused. In addition, the defense presented the testimony of Leila Naszkiewicz, mother of Michael Naszkiewicz, who also had been arrested in connection with the present offenses. Mrs. Naszkiewicz testified that she too encountered difficulty in attempting to contact her son while he was in police custody.

The trial judge denied the defendant's suppression motion, ruling that the defendant had given his statements voluntarily. In announcing his decision in open court, the judge did not distinguish between the different sets of statements made by the defendant or specify whether or not the ruling was limited to the defendant's confession in the Devine case, for which the defendant was then standing trial.

We are convinced, from our analysis of the transcript of the Will County suppression hearing and of the matters raised by the defendant in his original and amended suppression motions, that the earlier proceeding resolved issues pertinent to the admissibility of the defendant's statements with respect to the Goodman case. Although the defendant gave his statements at different times while in custody, the evidence presented at the Will County hearing was not limited to the relatively brief period on May 19 when the defendant spoke to authorities regarding the Devine murder. The basis for the defendant's motion was that his will was overborne by police officers shortly after he was taken into custody, and that the various statements he made in the ensuing days were all rendered involuntary by the initial illegalities. Success on the theories advanced by the defendant in support of his motion would require suppression of all the statements he made while in custody.

The Will County judge's ruling necessarily resolved issues pertinent to all the different statements made by the defendant while in police custody. Suppression of the

defendant's statements in the Devine case would have also necessitated suppression of the defendant's statements in the Goodman case. At the hearing, the defendant maintained that his volition was overborne by threats to prosecute his father for the Goodman offenses if the defendant did not confess to those crimes. Also, the defendant testified that at some point, apparently before he was questioned about either the Devine case or the Howell case, he ceased making requests for counsel and for telephone privileges because he knew that those requests would be denied. In rejecting the defendant's claims, the Will County judge necessarily determined issues pertinent to all three sets of statements made by the defendant while in police custody.

We agree with the defendant that the admissibility of his different sets of statements was not, strictly speaking, interdependent, and that there could be circumstances in which the later statements regarding the Devine case would be admissible while the earlier statements regarding the Goodman case would be inadmissible. But because of the sequence of the defendant's statements—the confessions in the Goodman case preceded the confession in the Devine case—the earlier statements could have been inadmissible, and the later statements admissible, only if the taint of the illegality compelling the suppression of the earlier statements had been attenuated by the time the defendant was questioned with regard to the Devine case. (See *Oregon v. Elstad* (1985), 470 U.S. 298, 310, 84 L. Ed. 2d 222, 232-33, 105 S. Ct. 1285, 1293; *People v. Strickland* (1989), 129 Ill. 2d 550, 557.) The State did not present an attenuation theory at the Will County hearing, however, permitting the defendant's motion to be resolved on issues common to all three sets of statements.

We note, moreover, that the defendant would have had ample incentive in the Will County proceeding to

seek the suppression of all his statements, including those with respect to the Goodman and Howell murders, even though he was not then standing trial on those particular charges. Suppression of the Goodman and Howell statements for *Miranda* violations would have effectively limited their admission at trial to use as impeachment evidence, and thus would have prevented the prosecution from introducing the statements during its case in chief as, for example, other-crimes evidence. (See *Oregon v. Hass* (1975), 420 U.S. 714, 43 L. Ed. 2d 570, 95 S. Ct. 1215; *Harris v. New York* (1971), 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643.) At the time of the suppression hearing in the Will County case, the defendant knew that the State would seek to use the other statements as other-crimes evidence and had filed a motion *in limine* seeking to prevent that use. In addition, suppression of the defendant's statements on grounds that they were coerced would have barred their use for any purpose, even for impeachment. (*Mincey v. Arizona* (1978), 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408.) These same strictures, including those concerning *Miranda* violations (*Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866), would have been applicable at the capital sentencing hearing conducted in the Will County case.

Defense counsel in the Will County prosecution apparently understood this to be the case, and recognized that the Will County judge's ruling determined the voluntariness of all the statements made by the defendant while in custody, and not just the statement he gave in the Devine case. After the Will County judge denied the defendant's suppression motion, defense counsel moved to preclude the State from using the confessions to the Goodman and Howell murders as proof of other crimes, which counsel believed the State was going to do. The motion alleged that the evidence would be unduly preju-

dicial; counsel did not also argue that the statements were involuntary, which would have barred their use for that purpose. Defense counsel apparently believed that the voluntariness issue had been determined by the ruling rendered by the judge on the suppression motion.

We do not find persuasive the defendant's additional contention that subsequent comments made by the Will County judge indicate that the judge did not resolve any issues pertaining to the admissibility of any other statements made by the defendant while in custody. The remarks cited by the defendant were made by the Will County judge at the conclusion of the sentencing hearing, more than three months after the suppression hearing conducted in that case. Discussing the State's evidence in aggravation, which consisted largely of the defendant's confessions to the Goodman and Howell murders, the Will County judge stated:

> "Now, the State, in presenting the Defendant's confession[s] to the subsequent murders, that was probably presented to indicate to the Court the additional aggravation which could lead to the imposition of the death penalty; i.e., that he had committed more than one murder, two or more; even though those confessions were not attacked in the aggravating and mitigating portion of this proceeding, the Defendant, through his Counsel, may still and may have filed motions to suppress those confessions. The fact that this Court had denied the motion to suppress the Defendant's confession as to the Devine homicide, which this Court is concerned with, that therefore, if the Circuit Court of Cook County, the Judge who may have the case on his call, will also deny the suppression, that the Court cannot engage in."

The Will County judge went on to conclude that the defendant did not have a significant criminal history, and for that reason the judge declined to sentence the defendant to death for the murder of Andrew Devine. Before this court, the defendant argues that the quoted

remarks are evidence that the Will County judge did not believe that he had decided any issue pertaining to the admissibility of the Goodman statements, and thus demonstrate that those issues were not actually resolved. We do not agree.

Even if the Will County judge did not recognize that he had determined the voluntariness of the other statements, his ruling on the defendant's suppression motion clearly resolved matters pertinent to the admissibility of the defendant's other statements. In considering whether collateral estoppel may be invoked in the present case, we have carefully examined the evidence and arguments presented at the Will County suppression hearing. Our analysis leads us to conclude that the Will County judge's ruling on the admissibility of the Devine statements resolved as well factual issues pertinent to the Goodman and Howell statements.

As an alternative argument justifying a suppression hearing in the instant case, the defendant contends that he wished to present, in the proceedings below, additional allegations and evidence concerning the treatment he received while in police custody. The defendant contends that these are exceptional circumstances warranting relaxation of the general rule that would preclude his relitigation of the suppression issue. See *People v. Hopkins* (1972), 52 Ill. 2d 1, 4.

The suppression motion filed by the defendant in the present case raised virtually the same grounds for relief as the motion that had been denied in the Will County case. In the motion filed in the present case, the defendant alleged that the officers made unfulfilled promises of leniency, denied his requests to speak to counsel, and made threats against his father. The one new allegation that the defendant sought to have determined in the present case was the allegation that he received only a

doughnut and a cup of coffee during his first 24 hours in police custody.

With regard to the allegation concerning the food provided to the defendant, we believe that the testimony presented at the Will County suppression hearing now forecloses the defendant from raising this additional argument. At the Will County hearing, one of the police officers testified that the defendant was given three meals a day, and other officers stated that the defendant was provided with soft drinks and cigarettes upon request. The defendant, in his own testimony at the Will County hearing, did not dispute that evidence. We do not consider the defendant's new allegation to be an exceptional circumstance that would necessitate a separate hearing in the present case.

The defendant also argued, in the proceedings below, that a separate hearing was required in the present case because he wished to present the testimony of three other witnesses in support of his motion. The defendant presented this argument to the trial judge shortly before trial, in a motion to reopen his suppression motion. Counsel identified the witnesses as Michelle Kury, Michael Naszkiewicz, and Michael's mother, Mrs. Leila Naszkiewicz, and said that they would describe the treatment Michelle and Michael received while in police custody in connection with the present offenses. Counsel believed that their testimony would corroborate the defendant's testimony in the Will County hearing.

Defense counsel did not, however, make an offer of proof regarding the testimony of these potential witnesses. One of the defense attorneys simply stated that, based on the police reports prepared in the case, it was his belief that Kury and Naszkiewicz would say that they were held a long time, were kept isolated, and were threatened with prosecution for murder. Later, in the course of the trial, defense counsel had the opportunity

to present evidence in support of this claim. Both Kury and Naszkiewicz testified in the State's case in chief. During cross-examination, defense counsel attempted to elicit from them information regarding the treatment they received while they were held in custody. Kury denied that she had been threatened with a murder charge if she did not cooperate with police. She said that she was held in custody for four or five days and was allowed to speak to her mother on the telephone. On cross-examination, Naszkiewicz also denied that the police told him that he could be charged with murder. Naszkiewicz did say, however, that he had not been allowed to see his parents, to make telephone calls, to change his clothes, or to bathe during the three days he was in custody.

Although Naszkiewicz provided testimony that was consistent with representations previously made by defense counsel, counsel did not then renew his request for a separate suppression hearing. It should be noted that the trial judge had previously stated, when he initially ruled that a separate suppression hearing was not necessary in the case, that a hearing would be held if later evidence so warranted. In failing to renew that request, defense counsel apparently recognized that Naszkiewicz's testimony was not particularly helpful. Accordingly, we need not consider in the present case the defendant's argument that evidence of police treatment of other suspects would be relevant here.

For the reasons we have described, we conclude that the Will County suppression hearing resolved the same factual issues that the defendant would now seek to submit to a separate hearing in Cook County. Accordingly, we conclude that the trial judge in the proceedings below did not err in declining to convene a separate hearing on the suppression motion filed by the defendant in the present case.

The defendant next argues that he was denied the effective assistance of counsel at the guilt-innocence phase of the proceedings because of the theories of defense pursued by his trial attorneys. The defendant contends that counsel effectively conceded his guilt for the charged murder and thus did not adequately test the prosecution's evidence against him.

In opening statement at the guilt-innocence phase of the proceedings, one of the defense attorneys told the jury that the defendant had committed the homicide charged but maintained that the defendant was guilty of voluntary manslaughter rather than murder. Later, however, the trial judge denied the defense request that the jury be instructed on voluntary manslaughter; in addition, the judge directed defense counsel not to argue that theory in summation. In closing argument, counsel then urged the jury to find the defendant not guilty of murder because the defendant had not intended to kill the victim. The defendant contends that neither of defense counsel's theories was supported by law, or by the particular facts of this case. The defendant asserts that counsel was ineffective for relying on these theories in the present case.

To prevail on a claim of ineffective assistance, a defendant must generally establish that counsel's performance was deficient and that he was prejudiced as a result of counsel's deficiency. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; see *People v. Albanese* (1984), 104 Ill. 2d 504, 526-27 (adopting standard).) To establish a deficiency in performance, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) To establish prejudice resulting from the deficiency, a defendant must

show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

At the time of the present offenses, voluntary manslaughter, a noncapital offense, was a Class 1 felony, punishable by a term of imprisonment of between 4 and 15 years. (See Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(b), 9—2(c), 1005—8—1(a)(4).) Voluntary manslaughter required proof that the defendant acted either under serious provocation or under a mistaken belief regarding the need for self-defense. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2.) Counsel sought here to demonstrate the provocation form of the offense by showing evidence of mutual combat between the defendant and the victim.

Although the defendant did not take the witness stand, defense counsel was able to elicit evidence regarding an altercation between the defendant and the murder victim. This testimony came during cross-examination of one of the prosecution witnesses, who was asked by defense counsel about an inculpatory statement made by the defendant prior to his formal confession. In that statement, the defendant said that he and the victim argued for 10 to 15 minutes over some photographs the victim refused to surrender. The defendant said that he punched and stabbed the victim when the victim refused to move from the bathroom doorway, where the two were standing. In addition to that evidence, the defendant, in his formal statement, said that he stabbed the victim after the victim began laughing at his request for the photographs. Defense counsel later sought jury instructions on the serious provocation theory, found in section 9—2(a) of the Criminal Code of 1961, contending that the killing occurred in the course of mutual combat; the trial judge denied the request, finding the evidence to be insufficient. Here, counsel did not know in advance

whether or not the trial judge would instruct the jury on a voluntary manslaughter theory. Although there seems to have been little evidence to support such a contention, the two trial attorneys attempted to do what they could to propound that defense. In light of the overwhelming evidence of the defendant's involvement in the killing, counsel might reasonably have considered a voluntary manslaughter theory to be the only reasonable course of defense. It is not at all unusual for a defendant facing a murder charge to argue that he is guilty instead of a less serious offense, such as voluntary manslaughter. See, e.g., *People v. Chevalier* (1989), 131 Ill. 2d 66; *People v. Reddick* (1988), 123 Ill. 2d 184.

We note, moreover, that the defendant expressly consented to this aspect of the defense strategy. Following opening statements, in which defense counsel urged the jurors to find the defendant guilty of voluntary manslaughter instead of murder, the trial judge made the following inquiry, outside the jury's presence:

"THE COURT: I just have one question and it's based on the—I can't think of the name of the case right now, but, Mr. Dosch, you've spoken with your client, relative to admitting guilt to the voluntary manslaughter, is that correct?

MR. DOSCH: As to the statement, that is what we are hoping to show.

THE COURT: And he's in agreement with your strategy in this case?

MR. DOSCH: Yes. We've had lengthy discussions with my client.

THE COURT: Is that correct, Mr. Page?

DEFENDANT PAGE: Yes."

The trial judge was alluding to *People v. Hattery* (1985), 109 Ill. 2d 449. In *Hattery*, a capital case, this court found that the defendant was denied the effective assistance of counsel when his trial attorney told the jury that the defendant, on trial for the murders of three persons,

was guilty of the charged offenses and instead used the trial solely as a means of developing the defense theory that the defendant had been compelled to commit the murders. Although compulsion is not a defense to a charge of murder, it may be sufficient to preclude imposition of the death penalty. (*Hattery*, 109 Ill. 2d at 459.) The majority believed that counsel's strategy was invalid, constituting ineffective assistance, unless the defendant's consent to it appeared on the record. (*Hattery*, 109 Ill. 2d at 464-65.) In the present case, the trial judge's special inquiry clearly was prompted by *Hattery*, as the judge's remarks indicate.

We believe that the defendant's express consent to the strategy adopted by counsel forestalls any objection, under *Hattery*, that counsel was ineffective for having initially chosen a theory of defense based on voluntary manslaughter. Accordingly, we decline to find counsel ineffective for that strategic decision. We do not mean to suggest, however, that the court's inquiry was necessarily required by *Hattery*. Unlike counsel in *Hattery*, counsel in the present case did not concede that the defendant was guilty of the principal offense. Counsel's strategy in this case followed the not uncommon practice of urging conviction on a lesser charge to avoid conviction on a greater charge.

To be sure, the defendant's express, of-record consent to the voluntary manslaughter theory does not answer the additional contention that counsel was ineffective for later urging the jury to return a not-guilty verdict because the defendant had not intended to kill the victim. We turn to that question next.

As we have noted, the trial judge refused the defendant's request that the jury be instructed on voluntary manslaughter. In addition, the trial judge directed counsel not to argue that theory in summation. At the close of trial, then, the defense attorneys found themselves in

the predicament of having to attempt to salvage a theory of the case, after the trial judge rejected their initial strategic choice. In summation, counsel urged the jurors not to find the defendant guilty of murder because the defendant had not intended to kill the victim. Before this court, the defendant correctly observes that the absence of an intent to cause death would not have precluded a conviction for murder. "Intent to kill" was not the sole mental state necessary to sustain the defendant's guilt for that offense. In the present case, the defendant was being tried for murder on a number of different theories, including felony murder, and the jury was instructed accordingly. See Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3).

Although we agree with the defendant that counsel's argument in summation was not a complete defense to the present charges, we do not agree with the defendant's further contention that counsel was ineffective for having chosen to pursue that line of argument. As we have stated, a defendant alleging ineffective assistance of counsel must generally establish that counsel's performance was deficient and that the deficiency was prejudicial. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) In exceptional cases, however, prejudice will be presumed; in those instances, the deficiency in performance, without more, serves to establish that the accused was denied the effective assistance of counsel. The defendant contends that counsel's closing argument in the present case was so egregious that the error by itself is sufficient to demonstrate ineffective assistance.

We do not agree with the defendant that this case is an appropriate one in which to dispense with the customary requirements that a party raising a claim of ineffective assistance must establish both a deficiency in counsel's performance and prejudice resulting from the error.

Those instances in which prejudice will be presumed are limited to circumstances in which the effect of the error, or the deprivation of counsel's assistance, is so clearly apparent that there would be no point in attempting to determine whether prejudice ensued following its commission. For example, "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance." (*Strickland*, 466 U.S. at 692, 80 L. Ed. 2d at 696, 104 S. Ct. at 2067.) Prejudice may also be presumed "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." (*United States v. Cronic* (1984), 466 U.S. 648, 659, 80 L. Ed. 2d 657, 668, 104 S. Ct. 2039, 2047; see also *People v. Johnson* (1989), 128 Ill. 2d 253, 266-67 (describing circumstances in which presumption of prejudice obviates separate prejudice inquiry).) None of these circumstances obtain here. The defendant was not denied legal representation. The State did not interfere with the assistance rendered by counsel. Counsel thoroughly tested the State's proof of guilt, cross-examining the prosecution witnesses, objecting to allegedly improper evidence and argument, and moving for directed verdicts on all the charges once the prosecution rested. Unlike the conduct found offensive by the majority in *Hattery*, in which defense counsel expressly invited the jury to find the defendant guilty of the principal offense (*Hattery*, 109 Ill. 2d at 458 (in opening statement, defense counsel told jury, " 'We are not asking you to find Charles Hattery not guilty. At the end of your deliberations, you will find him guilty of murder' " (emphasis omitted))), counsel's conduct in the present case did not concede that the defendant was guilty, but simply presented an incomplete argument for innocence.

Without determining here whether counsel's performance must be termed deficient in the *Strickland* sense

because of the "intent to kill" argument made in summation, we examine whether the defendant was prejudiced by that argument. A defendant bringing a claim of ineffective assistance of counsel generally must show not only a deficiency in counsel's performance but also prejudice resulting from the deficiency. If the conclusion is reached that the defendant did not suffer prejudice as a consequence of counsel's actions, then there is no need to determine separately whether counsel's performance was in fact deficient. (*Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) With respect to the prejudice component of the test, *Strickland* advises, "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." (*Strickland*, 466 U.S. at 691, 80 L. Ed. 2d at 696, 104 S. Ct. at 2066.) To establish actual prejudice resulting from a deficiency in counsel's performance, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

We do not believe that the defendant can properly show that he was prejudiced by defense counsel's closing argument. The evidence of the defendant's guilt was overwhelming. The defendant made detailed confessions to the crimes. An eyewitness saw the defendant at Goodman's house shortly before the victim disappeared. Other witnesses established that the defendant was in possession of property belonging to Goodman, including his car and credit cards. Finally, a witness testified that the defendant had access to Goodman's house shortly after he disappeared. On this record, we do not believe that the defendant can establish a reasonable probability that

the result of the trial would have been different if counsel had not presented the allegedly improper closing argument.

For these reasons, we find distinguishable *People v. Chandler* (1989), 129 Ill. 2d 233, on which the defendant relies. In *Chandler*, defense counsel informed the jury, both in opening statement and in closing argument, that the defendant's confession was accurate. In the confession, the defendant told police that he broke into the victim's home with an accomplice, and that the accomplice committed the murder in an upstairs bedroom while the defendant was ransacking the first floor of the house. Defense counsel apparently believed that the defendant could not be found guilty of murder if the defendant had not inflicted the fatal wounds. The defendant was being tried as an accomplice on several different theories of murder, including felony murder, however, and the court observed that the defendant could properly be convicted of murder on an accountability theory or on a felony-murder theory even though he was not present when the victim was killed.

In *Chandler*, counsel's misapprehension of the law had a pervasive effect on the entire course of the proceedings. Apart from admitting the accuracy of the defendant's statement, which was sufficient to convict him, counsel in *Chandler* committed several other errors, apparently in reliance on the defective theory of defense. The court noted that defense counsel did not develop a theory of innocence in cross-examining several witnesses, and failed entirely to cross-examine several key witnesses. The court also noted that defense counsel did not present any evidence, even though counsel, in opening statement, had vowed that the defendant would take the stand and explain what had occurred. (*Chandler*, 129 Ill. 2d at 248-49.) Thus, the defense strategy appeared to be flawed from its inception, and counsel's

fundamental error colored the entire course of the proceedings.

In the present case, in contrast, defense counsel's closing argument apparently was devised in response to the trial court's ruling rejecting the initial defense strategy, the voluntary manslaughter theory, to which the defendant had expressed his assent. The line of defense propounded in summation, however, did not otherwise affect the attorneys' representation of the defendant. During trial, the two defense attorneys vigorously cross-examined the prosecution witnesses, objected to allegedly improper lines of evidence and argument, challenged the accuracy of the defendant's confessions to the charged offenses, and succeeded in preventing the introduction of evidence of two other murders committed by the defendant. In addition, counsel made a motion for directed verdicts on all counts at the close of State's case in chief. Assuming that defense counsel's closing argument was deficient, we find no indication in the present case that any other aspect of the proceedings was affected by that error, or that the result of the trial would have been different if the challenged argument had not been made.

The defendant's final challenge to the trial proceedings concerns the presentation of certain evidence that, the defendant contends, was irrelevant and prejudicial. The challenged evidence was introduced during the testimony of the victim's mother, Juliet Goodman, who appeared as a "life and death" witness in the State's behalf. On direct examination, Mrs. Goodman testified as follows:

"Q. Did your family have a memorial service for John?

A. Yes.

Q. Could you tell us—strike that.

At some point did you learn that John's body had been recovered in the State of Wisconsin?

A. Well, that was after the memorial service, we did learn that it had been.

Q. Later you found that John's body was found, is that correct?

A. Yes.

Q. Did you have another memorial service at that time?

A. Well, when we received it, he was cremated and we received his ashes."

Mrs. Goodman also testified that the victim in this case was survived by a twin sister, who was married and had two children. The defendant now argues that the testimony concerning the memorial services and the victim's sister and her family was irrelevant and prejudicial.

As a preliminary matter, we note that defense counsel did not object to Mrs. Goodman's testimony or later raise the issue in the defendant's post-trial motion. Accordingly, the alleged error warrants relief only if it rises to the level of plain error. (See 134 Ill. 2d R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed [on appeal] although they were not brought to the attention of the trial court").) Assuming that the testimony now challenged by the defendant was in fact improper, we do not consider that its introduction into evidence may be considered plain error.

It is, of course, to be expected that the victim's family would conduct a memorial service or other, similar observance following his death. Moreover, that the victim in this case would be survived by a sibling and by other relatives is not at all remarkable. As this court observed in *People v. Free* (1983), 94 Ill. 2d 378, 415, "Common sense tells us that murder victims do not live in a vacuum and that, in most cases, they leave behind family members." In the present case, the challenged remarks were only incidental, coming from a single, brief

witness during the course of a lengthy trial. Unlike other cases in which reversible error has been found in the presentation of evidence of this nature during trial (see, e.g., *People v. Hope* (1986), 116 Ill. 2d 265, 274-79; *People v. Bernette* (1964), 30 Ill. 2d 359, 371-72; *People v. Dukes* (1957), 12 Ill. 2d 334, 340), the comments here were brief and were incidental to properly admitted testimony. Moreover, the prosecutor did not emphasize the testimony, or attempt to dwell on it as proof of the defendant's guilt of the charged offenses. For these reasons, we believe that any error in the presentation of this information was surely harmless. See *People v. Del Vecchio* (1989), 129 Ill. 2d 265, 287-89.

Finding no reversible error in the proceedings at the guilt-innocence phase, we affirm the defendant's convictions for murder, armed robbery, and home invasion.

## II. Sentencing Issues

The defendant argues that principles of double jeopardy and collateral estoppel bar imposition of the death sentence in this case. The defendant notes that a different sentencer had already declined to impose that penalty in an earlier proceeding in which much of the same evidence in aggravation and mitigation was presented. The defendant believes that the sentencer's rejection of the death penalty in the earlier case precludes imposition of that sentence in the present proceeding as well.

The earlier proceeding on which the defendant relies is the Will County prosecution, in 1988, in which he was convicted of the murder of Andrew Devine. In that case, a jury found the defendant guilty of murder. The same jury then found the defendant eligible for the death penalty because the murder was committed in the course of a felony, aggravated kidnapping. The defendant elected to waive the jury for the second stage of the capital sentencing hearing. Following the presentation of aggravat-

ing and mitigating evidence, the trial judge declined to impose the death penalty and instead sentenced the defendant to a term of 60 years' imprisonment for the murder conviction. (See *People v. Page* (1990), 196 Ill. App. 3d 285 (affirming defendant's conviction and 60-year sentence for the Devine murder).) The defendant now argues that the Will County judge's decision not to impose the death penalty in that case precludes imposition of the death penalty in this proceeding as well.

Because of the trial-type nature of a capital sentencing hearing, the protections of the double jeopardy clause are applicable to defendants in those proceedings. (*Bullington v. Missouri* (1981), 451 U.S. 430, 68 L. Ed. 2d 270, 101 S. Ct. 1852; *People v. Davis* (1986), 112 Ill. 2d 78.) A defendant may not again be subject to the death penalty in a particular case if the sentencing judge or jury or the reviewing court determines that the prosecution has failed to establish that death is appropriate punishment in the case. *Poland v. Arizona* (1986), 476 U.S. 147, 90 L. Ed. 2d 123, 106 S. Ct. 1749; *Arizona v. Rumsey* (1984), 467 U.S. 203, 81 L. Ed. 2d 164, 104 S. Ct. 2305; *Bullington v. Missouri* (1981), 451 U.S. 430, 68 L. Ed. 2d 270, 101 S. Ct. 1852.

The defendant recognizes, of course, that the Will County case and the case at bar involve distinct offenses and different victims. The defendant argues, however, that the sentencing hearing in the Will County case determined an issue of ultimate fact in his favor and that, under the rule of collateral estoppel applied by the Supreme Court in *Ashe v. Swenson* (1970), 397 U.S. 436, 25 L. Ed. 2d 469, 90 S. Ct. 1189, the State may not seek the death penalty in the present proceeding.

In *Ashe*, three or four masked intruders broke into a house and robbed six participants in a poker game. The defendant was tried for the robbery of one of the victims and was found not guilty. The defendant was later

placed on trial for the robbery of another victim, and he was convicted in that proceeding. The Supreme Court held that the judgment of acquittal entered in the initial prosecution barred the defendant's later trial for the robbery of a different victim. The Court believed that the initial case had determined an issue of ultimate fact adversely to the State, and that collateral estoppel, as an ingredient of the double jeopardy clause, precluded the State from relitigating the same issue against that particular defendant.

The defendant would apply the same principle here. It will be seen that the premise for this argument is that the Will County sentencing hearing determined, with respect to the same record of aggravation and mitigation, the general inappropriateness of the death penalty for this defendant. The defendant's argument misconceives the nature of the issues determined at a capital sentencing hearing.

It is certainly true, of course, that the relevant focus in a capital sentencing hearing is on the character of the offender and the circumstances of the offense. That inquiry requires a wide-ranging assessment of evidence in aggravation and mitigation. Because of the qualitative difference between a sentence of death and a sentence of imprisonment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (*Woodson v. North Carolina* (1976), 428 U.S. 280, 305, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.) As we discuss in greater detail later in this opinion, a defendant may not be precluded from introducing relevant evidence in mitigation. (See, *e.g., Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869.) These principles do not mean, however, that a sentencer's rejection of the death penalty in one case, on a particular record of aggravation and mitigation, establishes, even on virtually

the same record of aggravation and mitigation, the general inappropriateness of that penalty for other murders committed by the same defendant. The issue resolved in a capital sentencing hearing is not whether the defendant, in general, is deserving of the death penalty, but whether the defendant may, and should, be sentenced to death for a particular offense of murder.

As we have explained, a new capital sentencing hearing for a particular murder conviction would be precluded, on grounds of double jeopardy, if the sentencer in the original hearing concluded that the prosecution had not proved its case that death was the appropriate punishment—grounds tantamount to an acquittal—or if the reviewing court vacated the death sentence for corresponding reasons. (See *Poland v. Arizona* (1986), 476 U.S. 147, 90 L. Ed. 2d 123, 106 S. Ct. 1749; *Arizona v. Rumsey* (1984), 467 U.S. 203, 81 L. Ed. 2d 164, 104 S. Ct. 2305; *Bullington v. Missouri* (1981), 451 U.S. 430, 68 L. Ed. 2d 270, 101 S. Ct. 1852.) The trial judge in the Will County proceeding declined to sentence the defendant to death for the murder of Andrew Devine, concluding that the sentence was not appropriate in that case. The finding that death was inappropriate punishment for the defendant's conviction for that murder means, of course, that the defendant may not later be subject to the death penalty for the same offense. We do not agree with the defendant, however, that the trial judge's ruling can be said to bar imposition of the death penalty in other cases involving different murder convictions. That the same evidence in aggravation and mitigation might be admitted at a subsequent sentencing hearing does not alter our view of the matter.

The earlier proceeding in Will County did not determine whether or not the defendant is a person generally deserving of the death penalty; indeed, no proceeding ever makes that determination. We conclude that the fa-

vorable sentencing decision rendered in the earlier case does not collaterally estop the State from seeking, and obtaining, the death penalty here.

The defendant next challenges certain evidence introduced by the State during the eligibility stage of the death penalty hearing. At the first stage of the hearing, the State presented testimony concerning the murder of Andrew Devine in Will County in 1985. Admitted into evidence were a certified copy of the defendant's conviction for the murder, the defendant's confession to the crime, and the report of the autopsy conducted in the case. The State offered the evidence as part of its proof of the multiple-murder aggravating circumstance. Before this court, the defendant contends that certain details related in the confession and the autopsy report were irrelevant and inflammatory, and that this information improperly influenced the jury's determination of his eligibility for the death sentence.

At the first stage of the hearing, the defendant's confession to the Devine murder was read to the jury by the Cook County assistant State's Attorney who had taken the statement from the defendant. In the confession, the defendant said that in 1985 the murder victim, Andrew Devine, had "ripped off" a mutual acquaintance, Kenneth Chaney, in a drug deal. One day that fall, the defendant summoned Gerald Feinberg and Chaney to his house, where Devine was staying at the time. Feinberg arrived first, and he and the defendant bound Devine with an extension cord. Chaney arrived after that, and he melted some barbiturates in a spoon and injected Devine with the liquid. At some point, the defendant took more than $100 in cash from Devine's pocket. The defendant, Feinberg, and Chaney later put Devine in a car and drove to a rural area in Will County. There, they removed Devine from the car and asked him whether he would prefer being killed by injection or by stabbing. De-

vine said he would prefer injection. Chaney then took the needle and injected air into Devine's arm several times. When that failed to kill Devine, Chaney slit the victim's throat with a knife. At Chaney's urging, both the defendant and Feinberg then stabbed Devine in the chest. In his statement, the defendant said that Devine begged for his life and promised to repay the money he had taken from Chaney. The defendant also said that after the murder, he, Feinberg, and Chaney went to Chaney's house, where they smoked marijuana and drank. Two days later, the defendant and Chaney returned to the area where they had left Devine's body. At that time, they poured gasoline on the corpse and set it on fire.

The report of the autopsy conducted in the Devine case was also admitted into evidence and read to the jury at the first stage of the sentencing hearing. According to the report, the cause of death was a stab wound to the chest. The report also described the decomposed condition of the body when it was discovered.

The defendant now argues that a number of details related in the confession and autopsy report were irrelevant and unduly inflammatory. Specifically, the defendant objects to the statements in the confession that the victim begged for his life, that the three offenders consumed alcohol and marijuana after the crime, and that the defendant and Chaney later returned to the site of the murder and set the victim's body on fire. With regard to the autopsy report, the defendant objects to the information that the victim's body was partially skeletonized when it was discovered, and that maggots were present. The defendant contends that none of these details were relevant to the jury's consideration of the multiple-murder aggravating circumstance, for which this evidence was offered.

We believe that the defendant waived any objection to these matters, and that relief is appropriate now only if the alleged errors are sufficiently serious as to constitute plain error. (See 134 Ill. 2d R. 615(a).) At the sentencing hearing, defense counsel objected on relevance grounds to the presentation of the defendant's confession. The trial judge overruled the objection and admitted the evidence, concluding that it was relevant because it tended to show the defendant's intent at the time of the offense. The court believed that the testimony tended to show whether the defendant acted with the requisite intent at the time of the Devine murder, which the State sought to use to establish the multiple-murder aggravating circumstance. (See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3) ("the defendant has been convicted of murdering two or more individuals *** regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts").) Counsel raised a relevance objection to the introduction of the defendant's confession, apparently on the ground that the confession itself, and not just certain details related in it, was irrelevant. When the objection was overruled, defense counsel did not seek to redact from the confession the details now challenged. Later, when the prosecution sought to introduce the autopsy report into evidence, the trial judge specifically asked defense counsel whether he had any objection to the report, and counsel replied that he did not.

We believe that the testimony now complained of was merely incidental to properly admitted evidence establishing the defendant's eligibility for the death penalty. (See *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 396.) Moreover, the prosecutor did not later emphasize these matters to the sentencing jury. It is true that the prose-

cutor made reference, in rebuttal argument, to the decomposed state of the victim's body, as related in the autopsy report. These comments were merely in response, however, to defense counsel's closing argument, in which counsel challenged the accuracy of the defendant's confession to the Devine murder on the ground that certain details in the confession were not corroborated by the physical evidence.

Assuming that these details were erroneously admitted into evidence, we do not believe that the evidence now challenged by the defendant could have had any effect on the jury's determination that the defendant was eligible for the death penalty. As we have stated, the eligibility determination rested on three separate grounds: the defendant's commission of murder in the course of armed robbery, his commission of murder in the course of home invasion, and his multiple convictions for murder. The evidence at the first stage of the sentencing hearing was not closely balanced. The defendant's eligibility for the death penalty was established through two other aggravating circumstances—murder in the course of armed robbery, and murder in the course of home invasion. The evidence for these circumstances was supplied by the verdicts the same jury had returned, two days earlier, at the conclusion of the guilt phase of the proceedings. On this record, we decline to consider the presentation of these details as plain error. See *Pitsonbarger*, 142 Ill. 2d at 394; *People v. Walker* (1985), 109 Ill. 2d 484, 504-05.

The defendant next contends that the prosecutor, in argument at the conclusion of the second stage of the sentencing hearing, unfairly disparaged the mitigating evidence introduced by the defense and misadvised the jurors that they were to consider only "sufficient mitigation" in their deliberations. The defendant believes that the prosecutor's remarks prevented the sentencing jury

from giving adequate consideration to the mitigating evidence.

In rebuttal argument at the close of the second stage of the sentencing hearing, the prosecutor made the following comments:

> "The defense. The Defendant says that mitigation is not excuses. Well, we'll take great exception to that. I will tell you why. First of all the law is sufficient mitigation, not just plain mitigation. Anything can be mitigation if you so deem it to be. But sufficient mitigation. I will tell you right now that I'm going to use the mitigation brought out by the Defendant, whatever was brought out, and I'm going to tell you it's in the category of aggravation and this is why. It's excuses. Nothing more and nothing less but plain, simple excuses, a cop out.
>
> The Defendant seeks to hire two people from the same firm to delve into his life and come up with something that they can zero in on and say, bring the teachers, the school, parents, bring this and that and try to mold it into something that is sufficient mitigation. Well, we have news for you. This guy didn't have such a bad life, did he now? Look at his life."

Continuing in the same vein, the prosecutor went on to argue that many persons suffer the same disadvantages as the defendant did yet are able to lead peaceful, law-abiding lives.

Defense counsel made no objection to these comments. The defendant now contends that the prosecutor committed plain error in stating that the defendant's mitigating evidence was actually aggravating, and in telling the jurors to consider only "sufficient mitigation" in determining whether to impose the death penalty. The defendant believes that the effect of the prosecutor's remarks was to improperly restrict the jury's consideration of the mitigating evidence introduced by defense counsel at the sentencing hearing. We do not agree.

To pass constitutional muster, a capital sentencing scheme must allow an individualized consideration of the offense and the offender. (*Sumner v. Shuman* (1987), 483 U.S. 66, 73-76, 97 L. Ed. 2d 56, 64-66, 107 S. Ct. 2716, 2721-23; *Woodson v. North Carolina* (1976), 428 U.S. 280, 303-05, 49 L. Ed. 2d 944, 960-61, 96 S. Ct. 2978, 2990-91 (plurality opinion).) Toward that end, the sentencing authority in a capital case may not be precluded from considering, or refuse to consider as a matter of law, any relevant mitigating evidence offered by the defense. (*Hitchcock v. Dugger* (1987), 481 U.S. 393, 95 L. Ed. 2d 347, 107 S. Ct. 1821; *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869; *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (plurality opinion).) "The requirement of individualized sentencing in capital cases is satisfied by allowing the [sentencer] to consider all relevant mitigating evidence." (*Blystone v. Pennsylvania* (1990), 494 U.S. 299, 307, 108 L. Ed. 2d 255, 264, 110 S. Ct. 1078, 1083.) As the defendant correctly observes, evidence of mental handicap (*Penry v. Lynaugh* (1989), 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934) and evidence of a turbulent family life (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869) are both relevant mitigation.

Nothing requires the prosecution, however, to agree with the defendant that the evidence offered in his behalf is sufficiently mitigating to preclude imposition of the death sentence, or that it is even mitigating at all. Just as the sentencer or reviewing court "may determine the weight to be given relevant mitigating evidence" (*Eddings*, 455 U.S. at 114-15, 71 L. Ed. 2d at 11, 102 S. Ct. at 877; see also *People v. Henderson* (1990), 142 Ill. 2d 258, 338-41), so too may the prosecutor, during the sentencing hearing, contest the significance or weight of the defendant's evidence (*People v. Bean*

(1990), 137 Ill. 2d 65, 124-27). Here, the prosecutor's argument did not restrict or limit the defendant's presentation of mitigating evidence in any way, or misstate to the jurors the applicable law governing their consideration of the evidence. In his argument, the prosecutor simply discounted the significance of the defendant's mitigation, urging the jury to reject that evidence as grounds for declining to impose the death sentence. The prosecutor observed that the problems encountered by the defendant as a youth were not unique, and he expressed the view that the defendant's difficult upbringing did not warrant a sentence other than death. A prosecutor may, of course, disagree with a defendant's own assessment of the nature and character of the evidence in mitigation. For these reasons, we conclude in the present case that the prosecutor's vigorous challenge to the strength of the defendant's mitigating evidence was not improper.

In his final challenge to the proceedings conducted at the sentencing hearing in the present case, the defendant contends that the prosecutor made a remark, in closing argument, that would have improperly reduced the jury's sense of responsibility for the verdict it was being called upon to render.

In rebuttal argument at the close of the second stage of the sentencing hearing, the prosecutor stated:

"The Defendant, as Mr. Stake [the other assistant State's Attorney] said, sentenced himself in this case. He really did. He really sentenced himself."

Defense counsel did not then object to the prosecutor's comment or later raise the point in the post-trial motion. The defendant now argues that the quoted remark was in violation of the Supreme Court's decision in *Caldwell v. Mississippi* (1985), 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633, and that trial counsel was ineffective for having failed to object to it. *Caldwell* found constitu-

tional error in a prosecutor's arguments, to which defense objections were overruled, that the sentencing jury's decision was not final because it would be subject to judicial review.

Wide latitude is allowed in closing argument, and the nature of an allegedly objectionable comment must be assessed in the context in which it was made. (*People v. Fields* (1990), 135 Ill. 2d 18, 62, 64.) Discussing a similar remark in *People v. Kokoraleis* (1989), 132 Ill. 2d 235, 286, this court stated:

> "The defendant argues that during rebuttal argument the prosecutor improperly advised the jurors to follow the law by sentencing the defendant to death, and by remarking that the defendant sentenced himself to death each time he abducted one of the victims. We believe that the jury would have correctly understood the remarks not as literal statements of law but as comments on the evidence, and we do not believe that they denied the defendant a fair sentencing hearing."

The same observation is true here. The prosecutor made no attempt to suggest to the jurors that they were relieved of their responsibility by the defendant's own actions. The jury was correctly instructed on its role in the sentencing process, and we do not believe that the jury would have interpreted the prosecutor's comment as contradicting those instructions. See also *People v. Pasch* (1992), 152 Ill. 2d 133, 204-06.

We believe that *Buttrum v. Black* (N.D. Ga. 1989), 721 F. Supp. 1268, *aff'd per curiam* (11th Cir. 1990), 908 F.2d 695, cited by the defendant, is readily distinguishable. *Buttrum* found a *Caldwell* violation in a prosecutor's argument to the jury that the defendant had " 'signed her own death warrant' " and that the jurors were merely a cog in the criminal justice process. The district judge thought that those comments violated *Caldwell* because "the prosecutor's forceful argument

that the ultimate responsibility lay with Janice Buttrum herself, and that they were merely 'one cog in the criminal process' may have affected the sentencing decision." (Emphasis omitted.) (*Buttrum*, 721 F. Supp. at 1317.) The district judge also found a number of other errors in the sentencing phase of the *habeas* petitioner's capital trial and accordingly granted her relief with respect to that portion of the proceedings.

In the present case, the prosecutor did not attempt to reduce the jury's sense of responsibility for the decision it was required to make. As we have stated, the jurors would have interpreted the rebuttal argument as a comment on the strength of the aggravating evidence, and we do not believe that the State violated *Caldwell*. Accordingly, we need not determine whether defense counsel was ineffective for failing to object to the remark.

In his final series of arguments, the defendant raises several challenges to the facial validity of the Illinois death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1). The defendant contends that various aspects of the sentencing scheme violate the eighth and fourteenth amendments (U.S. Const., amends. VIII, XIV). We have already rejected identical challenges to the statute, however, and the defendant does not offer any persuasive reason that would warrant our reaching a different conclusion in the present case.

The defendant first argues that the prosecution should not enjoy the benefit of making both opening and rebuttal arguments at the conclusion of the second stage of the sentencing hearing. The defendant contends that this practice is inconsistent with the burden of persuasion he believes the statute places on capital defendants. As we explain below, however, the death penalty statute does not impose a burden of persuasion on a capital defendant. Moreover, we have previously determined that the State, as the moving party at the sentencing

hearing, is entitled to present both opening and rebuttal argument. *People v. Ramirez* (1983), 98 Ill. 2d 439, 468-69; *People v. Williams* (1983), 97 Ill. 2d 252, 302-03.

The defendant next contends that the death penalty statute bars the sentencing authority from giving meaningful consideration to a defendant's evidence in mitigation. The defendant bases this contention on the statutory language directing that the death sentence is to be imposed, following a finding of eligibility, if the sentencing authority, judge or jury, "determines that there are no mitigating factors sufficient to preclude the imposition of" that death sentence. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(g), (h).) The jury instructions used at the defendant's sentencing hearing, in 1990, contained this same language. (Illinois Pattern Jury Instructions, Criminal, Nos. 7C.05, 7C.06, 7C.08 (2d ed. Supp. 1989).) The defendant believes that the language of the statute effectively requires a capital defendant to negate the same sentencer's earlier finding of death-eligibility. This court recently rejected this same contention, however, concluding that it rests on a strained interpretation of the statutory language (*People v. Strickland* (1992), 154 Ill. 2d 489, 538-39; *People v. Mitchell* (1992), 152 Ill. 2d 274, 345-46; *People v. Hampton* (1992), 149 Ill. 2d 71, 115-17), and we see no reason to reach a different result here.

As a final matter, the defendant argues that various aspects of the death penalty statute, working in combination, invite the arbitrary and capricious imposition of that sentence. This court has, on other occasions, rejected challenges to the same features of the statute cited by the present defendant. Thus, it has been held that the statute is not invalid for affording the prosecutor discretion in determining whether to seek the death penalty in a particular case. (*People v. Lewis* (1981), 88 Ill. 2d 129, 146; *People ex rel. Carey v. Cousins* (1979),

77 Ill. 2d 531, 534-43; see also *Silagy v. Peters* (7th Cir. 1990), 905 F.2d 986, 993-94.) The statute is not invalid for failing to require the prosecution to provide an accused with pretrial notice either of its intent to seek the death penalty (*People v. Silagy* (1984), 101 Ill. 2d 147, 161-62; *People v. Gaines* (1981), 88 Ill. 2d 342, 369) or of the aggravating evidence to be introduced at the sentencing hearing (*People v. King* (1986), 109 Ill. 2d 514, 547-48; *People v. Albanese* (1984), 104 Ill. 2d 504, 539; *Gaines*, 88 Ill. 2d at 369).

In addition, comparative proportionality review is not required by the Federal Constitution (*Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871), and our State's statute is not invalid for failing to provide for such review (*King*, 109 Ill. 2d at 551; *People v. Stewart* (1984), 104 Ill. 2d 463, 499; *People v. Kubat* (1983), 94 Ill. 2d 437, 502-04; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44). The statute is not invalid for failing to impose on the State a burden of persuasion at the second stage of the sentencing hearing (*People v. Jones* (1988), 123 Ill. 2d 387, 426; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 68; *People v. Free* (1983), 94 Ill. 2d 378, 421), nor does the statute unconstitutionally cast on the defendant the burden of establishing that a sentence other than death should be imposed in his case (*Silagy*, 905 F.2d at 998-99; *People v. Fields* (1990), 135 Ill. 2d 18, 76; *People v. Orange* (1988), 121 Ill. 2d 364, 390; *People v. Caballero* (1984), 102 Ill. 2d 23, 49). Finally, there is no requirement that a capital sentencing jury be informed of the potential length of the prison term that will be imposed if the defendant is not sentenced to death. *People v. Phillips* (1989), 127 Ill. 2d 499, 543; *People v. Albanese* (1984), 102 Ill. 2d 54, 81.

In view of the substantial body of case law upholding these separate aspects of the death penalty statute, we must reject the defendant's further contention that these

same features of the statute, working cumulatively, enhance the risk that the sentence might be imposed in an arbitrary and capricious manner. (*People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 409; *People v. Kokoraleis* (1989), 132 Ill. 2d 235, 292-93.) As this court stated previously, "If all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional." *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43.

\* \* \*

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Wednesday, September 15, 1993, as the date on which the sentence of death, entered in the circuit court of Cook County, is to be carried out. The defendant shall be executed in the manner provided by law (Ill. Rev. Stat. 1991, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Affirmed.*

JUSTICE HARRISON took no part in the consideration or decision of this case.