NOTICE: Under Supreme Court Rule 367 a party has 21 days after

the filing of the opinion to request a rehearing. Also, opinions

are subject to modification, correction or withdrawal at anytime

prior to issuance of the mandate by the Clerk of the Court.

Therefore, because the following slip opinion is being made

available prior to the Court's final action in this matter, it

cannot be considered the final decision of the Court. The

official copy of the following opinion will be published by the

Supreme Court's Reporter of Decisions in the Official Reports

advance sheets following final action by the Court.

                                    

               Docket No. 78736--Agenda 4--September 1996.

    THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ALDWIN McNEAL,

                               Appellant.

                     Opinion filed January 30, 1997.

                                    

     JUSTICE HARRISON delivered the opinion of the court:

     In the circuit court of Lake County a jury found the

defendant, Aldwin McNeal, guilty of three counts of first degree

murder (720 ILCS 5/9--1(a)(3) (West 1994)) in the deaths of each of

two persons, Cory Gerlach and Perry Austin, and two counts of armed

robbery (720 ILCS 5/18--2(a) (West 1994)). Prior to trial

defendant's case was severed from that of his codefendant, James

Woods. At a separate sentencing hearing, the jury found defendant

eligible for the imposition of the death penalty and determined

further that there were no mitigating factors sufficient to

preclude the imposition of that sentence. The circuit court

sentenced defendant to death accordingly and to a concurrent term

of 30 years in prison for the conviction of armed robbery of Cory

Gerlach. Following a hearing the circuit court denied his post-

trial motion for a judgment of not guilty notwithstanding the

jury's verdict or for a new trial or a new sentencing hearing. The

cause comes directly to this court for review (Ill. Const. 1970,

art. VI, §4(b); 134 Ill. 2d R. 603), where defendant presents eight

issues for our consideration. For the reasons that follow, we

affirm the judgment of the circuit court.

     We turn first to defendant's contention that the trial court

erred in denying his motion to suppress as physical evidence a

handgun recovered during a warrantless search of one of his garbage

cans located outside the townhouse in which he resided. Although

the armed robbery and murders of which defendant has been convicted

occurred on or about April 7, 1994, the defendant was not

implicated in these offenses until tests that were performed upon

the handgun seized from his garbage can during an unrelated

incident on April 20, 1994, indicated that it was the weapon used

to shoot Gerlach and Austin. Defendant maintains that the officer's

warrantless search of the garbage can and seizure of the handgun

violated his fourth amendment rights because he maintained a

reasonable expectation of privacy in the contents of the garbage

can, which was situated, he argues, within the curtilage of his

residence. The can was sitting on grass about two feet from the

sidewalk and was leaning against the back of his townhouse, near

the back door and, it seems, near a barbecue grill. Marked with the

number of his townhouse, the can had to be wheeled to the edge of

the alley in order for the garbage collector to empty it of trash.

     At the hearing on his motion to suppress the handgun as

evidence, the State argued, as it does here, not only that the

defendant had no expectation of privacy in the contents of the

garbage can but also that there had been exigent circumstances

justifying the officer's search of it. In denying the motion, the

trial court found that because the garbage can was located so near

the sidewalk the defendant did not have a reasonable expectation of

privacy in items placed in it. The court made no finding concerning

exigent circumstances to justify the search. However, even if we

assume, without deciding, that the defendant did have a reasonable

expectation of privacy as to the property seized from the garbage

can and to the area searched as being within the curtilage of his

dwelling, it is clear that the exigencies of the situation

justified the officer's warrantless search of the can and his

seizure of a paper bag containing the handgun from it.

     At the hearing on this motion, Officer Terry Richards of the

Zion police department testified that at about 8:50 p.m. on April

20, 1994, he received a call directing him to the alley behind the

defendant's townhouse, which was one of four units in the building.

He drove a marked squad car and wore a police uniform. Upon his

arrival in the alley, he spoke immediately with two females who met

him there. The two told him that they had been in the alley with

defendant when an argument had ensued between defendant and one of

them, Sophia Degraffenreid, in which defendant had punched Sophia

in the neck and had thrown her to the ground. Defendant had asked

her if she was going to call the police and had told her he was

going to his apartment to get a gun. The two then called the police

and, when they saw the squad car come into the alley, went back

into the alley, approached Officer Richards, and told him about the

incident with defendant.

      As they did so, the officer stood with his back to the

building containing defendant's townhouse. The officer testified

that the two then told him that "Aldwin McNeal had just come out,

saw the police, dropped a bag into the garbage can and went back

into the door real quick." They described the bag as a brown paper

one. Officer Richards then walked over to the apartment and the

garbage can, which was, as we have said, about two feet from the

sidewalk, opened the can, and saw a brown paper bag resting on top

of another bag of garbage near the top of the can. He removed the

brown paper bag, opened it, and found a loaded 9 millimeter handgun

inside. He unloaded the weapon, secured it, and attempted to make

contact at the door of 2136 Hebron, which was defendant's address

at the time. When he knocked on the door, James Woods and a woman

named Andrea Green answered it.

     Officer Richards did not search the other of defendant's

garbage cans, explaining, "[T]hey said he stepped out, opened up

the garbage can, set the bag in there, went back inside, so I

checked that garbage can." Officer Richards was familiar with this

area from his duties as a police officer and knew that children

live, as he said, "in that entire block" and that members of the

public, including children, use the sidewalk near the garbage can

regularly at that time of the evening. The defendant was not

arrested concerning any conduct alleged with respect to Sophia

Degraffenreid on April 20, 1994.

     The physical entry of the home is the chief evil against which

the fourth amendment is directed. Payton v. New York, 445 U.S. 573,

585, 63 L. Ed. 2d 639, 650, 100 S. Ct. 1371, 1379-80 (1980). A

basic principle of fourth amendment law is that searches and

seizures inside a home without a warrant are presumptively

unreasonable. Payton, 445 U.S. at 586, 63 L. Ed. 2d at 651, 100 S.

Ct. at 1380. The curtilage, that is, the land immediately

surrounding and associated with the home, has been considered part

of the home itself for fourth amendment purposes, and courts have

extended fourth amendment protection to it. Oliver v. United

States, 466 U.S. 170, 180, 80 L. Ed. 2d 214, 225, 104 S. Ct. 1735,

1742 (1984). "In terms that apply equally to seizures of property

and to seizures of persons, the Fourth Amendment has drawn a firm

line at the entrance to the house. Absent exigent circumstances,

that threshold may not reasonably be crossed without a warrant."

Payton, 445 U.S. at 590, 63 L. Ed. 2d at 653, 100 S. Ct. at 1382.

Between the intrusiveness of entries to search and entries to

arrest no constitutional difference exists. People v. Abney, 81

Ill. 2d 159, 166 (1980). "[A]ny differences in the intrusiveness of

entries to search and entries to arrest are merely ones of degree

rather than kind. The two intrusions share this fundamental

characteristic: the breach of the entrance to an individual's

home." Payton, 445 U.S. at 589, 63 L. Ed. 2d at 652-53, 100 S. Ct.

at 1381.

     The State bears the burden of demonstrating exigent need for

a warrantless search or arrest. People v. Foskey, 136 Ill. 2d 66,

75 (1990). Where the facts and the credibility of the witnesses are

undisputed, as here, the question of whether exigent circumstances

are present is a question of law, subject to consideration by this

court de novo. Abney, 81 Ill. 2d at 168. While each case must be

decided on the basis of the facts presented (Abney, 81 Ill. 2d at

173), factors that this court has considered relevant to a

determination of exigency in circumstances involving warrantless

entry into a private residence to effectuate an arrest include

whether: (1) the crime under investigation was recently committed;

(2) there was any deliberate or unjustified delay by the police

during which time a warrant could have been obtained; (3) a grave

offense was involved, particularly a crime of violence; (4) there

was reasonable belief that the suspect was armed; (5) the police

officers were acting on a clear showing of probable cause; (6)

there was a likelihood that the suspect would escape if he was not

swiftly apprehended; (7) there was strong reason to believe the

suspect was in the premises; and (8) the police entry was made

peaceably, albeit nonconsensually (People v. Williams, 161 Ill. 2d

1, 26 (1994)). Insofar as these factors are relevant to the

circumstances involved in Officer Richards' search of the

defendant's garbage can, we consider them here, bearing in mind

that the fundamental guiding principle is reasonableness, in accord

with constitutional provisions governing searches and seizures

(Williams, 161 Ill. 2d at 26). No list of factors bearing on

exigent circumstances is exhaustive (Foskey, 136 Ill. 2d at 75),

and these factors are merely guidelines rather than cardinal maxims

to be applied rigidly in each case. People v. White, 117 Ill. 2d

194, 216-17 (1987). To determine whether the police acted

reasonably, the court must look to the totality of the

circumstances confronting the officers at the time the entry was

made. Williams, 161 Ill. 2d at 26. These circumstances must

militate against delay and justify the officers' decision to

proceed without a warrant. Foskey, 136 Ill. 2d at 75.

     In the instant case, the officer had reason to believe that in

his presence defendant was furthering the criminal activity under

investigation. Officer Richards engaged in neither deliberate nor

unjustified delay during which time a search warrant could have

been obtained. Indeed, he acted immediately upon hearing that the

defendant had emerged from his residence, seen the police, dropped

a brown paper bag into the garbage can, and retreated hastily

inside. A crime of violence was involved in which, after having

allegedly punched Degraffenreid in the neck and thrown her to the

ground, defendant had inquired whether she was going to call the

police and had told her that he was going to his apartment to get

a gun. This conduct and threat had prompted the call to police.

Very shortly after having made this threat, the defendant was

observed to engage in behavior consistent with carrying it out.

Having probable cause to believe that a crime was being committed

and that the garbage can contained evidence of crime, the officer

peaceably lifted the lid of the garbage can, removed the brown

paper bag, examined its contents, and found a loaded handgun.

     Prior to ascertaining the contents of the paper bag, Officer

Richards could not know with certainty whether the bag contained

the gun defendant had said he was going to get from his apartment

or whether defendant might be yet in the process of making good on

his promise to obtain it with the result that the complainant and,

possibly, her companion as well as others might be in danger of

attack with it by the defendant. Although defendant argues that the

officer could have assured the safety of passersby had he remained

where he was while others attempted to secure a warrant to search

the garbage can, such an approach could not have alleviated any

danger that during such time the defendant might, in fact, be

armed, as he had said he would be, and might injure others. The

officer limited his search to the garbage can in which defendant

had reportedly deposited the brown paper bag and to the brown paper

bag itself, in accord with the principle that warrantless police

action must be strictly circumscribed by the exigencies that

justify its initiation (Abney, 81 Ill. 2d at 173-74). We conclude

that under the totality of the circumstances confronting the

officer at the time the entry into defendant's garbage can was

made, the officer acted in a reasonable fashion. Because exigent

circumstances justified his decision to proceed without a search

warrant, there was no constitutional infirmity in the warrantless

search and seizure challenged here. Therefore, the trial court did

not err in denying defendant's motion to suppress the handgun as

physical evidence.

     Some of the evidence adduced at trial includes the following.

The bodies of the two victims, who were friends, were found lying

face down on the floor in the back of Maude's Pizza in Waukegan at

about 3 a.m. on April 8, 1994, when friends of Cory Gerlach noticed

that the lights were on and stopped to see if Cory, who was the

manager there, was cleaning the restaurant. Both men had been shot

in the back of the head, Austin at near contact or very close range

and Gerlach at contact range with the bullet passing first through

his right hand, which had been raised to the back of his head.

Usually Maude's closed between 11:30 p.m. and midnight. Between

11:20 and 11:30 p.m. on April 7, Gerlach bought a six-pack of beer

from a neighboring bar and liquor store and visited with the

bartender for about five to seven minutes. At about 11:34 p.m. a

person parked in front of the liquor store heard a "bang."

     Defendant's wife, Regina, identified the handgun retrieved

from their garbage can as defendant's. She testified to having

entered a plea of guilty to the "felony charge of unlawful use of

weapons" in this case because she had bought bullets for defendant

on April 5, 1994, at his request. On April 7 defendant and James

Woods, who was living with the McNeals at the time, picked her up

from work in Waukegan at about 10:45 p.m in her automobile, a black

Mustang that had been blue. Defendant, who was wearing a blue

pullover, is taller and thinner than Woods. As Regina McNeal drove,

defendant said that he had to make a stop and told her to drive

into an alley, which was located near Maude's Pizza. She thought

that he was going into the nearby liquor store and stopped the car

near it. However, defendant said he was not going into the liquor

store and "had to do something that he had to do right then and

there." She responded by saying that she wanted him to take her

home because she "didn't want to get caught up in his bullshit."

When he said he could not take her home, that what he had to do he

had to do then, she and defendant argued. Upon his instructions,

she backed the car down the alley under a light pole and into a

space near a row of stores. As defendant and Woods were getting

ready to leave the car, defendant told Woods to "get the stuff."

When Regina told defendant she was leaving, he told her to take the

car. As defendant and James Woods were getting out of the car and

going toward the trunk and as she herself was about to get out of

the car, she observed a light on in a third-floor apartment and a

woman in the window. Defendant and Woods then went in the direction

of a business, and Regina walked north about a mile and a half to

the home of defendant's brother Tyron and his wife.

     At their home Regina told Tyron's wife, Cecilia, that she and

defendant had argued and asked if she could use their telephone to

call a cab. After calling the cab, she and Cecilia talked for about

20 or 30 minutes, whereupon defendant arrived and told her to come

with him. After calling the cab to cancel it, she left with

defendant, who was in her car with James Woods. In the car Regina

noticed on the driver's side of the back seat what she thought was

some stereo equipment, which she had not seen before defendant's

arrival at Tyron's house. On North Avenue defendant, who was

driving, stopped by the side of the road, and he and Woods "threw

some things out." When the three arrived home, she went to bed, but

defendant and Woods went out. She recognized the stereo receiver

that was in evidence as one she had first noticed in her apartment

about two days after this incident.

     On April 23, 1994, officers searched defendant's apartment and

found in the living room of it Gerlach's Yamaha stereo receiver,

the serial number of which had been scratched off. The model number

of the receiver, which was identified as Gerlach's, was the same as

that on the owner's manual to such a stereo unit found at Maude's

Pizza.

     Cecilia McNeal testified that at about midnight or in the

early morning of April 8, 1994, defendant's wife came alone to her

house, asked to call a cab, and waited for it to arrive. When the

defendant arrived later in a "blue" car, came in the house, and

asked Regina to come with him, Regina did so. Although Regina

called the cab company back upon Cecilia's request, the cab had

already arrived.

     The parties stipulated that if the taxicab driver dispatched

by Lake County Transportation were called as a witness, he would

testify that on April 7, 1994, at 11:51 p.m. a telephone request

was received for a taxicab to be sent to 2205 North Jackson Street

in Waukegan, which is the address of Tyron and Cecilia McNeal, to

pick up Regina McNeal, to take her to the 2100 block of Hebron

Avenue in Zion, which was the address of Regina and defendant at

the time. When the driver arrived at 2205 North Jackson, within

five minutes of having received the dispatch at 12:07 a.m., he

found no one outside waiting for a cab. However, at 12:15 a.m. the

driver received a communication from headquarters canceling the

request.

     The parties stipulated further that if Marge Ponzio were

called as a witness, she would testify that on or about April 9,

1994, she was walking along North Avenue between Yorkhouse Road and

Blanchard Road when she found a book of checks with the business

name of Maude's Pizza, a check-cashing card bearing the name of

Cheryle Brown, who was the owner of Maude's Pizza and the mother of

Cory Gerlach, several business cards of Cheryle Brown, a roll of

pennies, and other miscellaneous items. The items she found were

entered into evidence.

     Penny Lee Hill testified that at the time in question she

lived in a third-floor apartment in a building connected to Maude's

Pizza. A light illuminated the parking lot for her building. At

about 11:15 to 11:20 p.m. on April 7, 1994, she was sitting near

the window in her living room while watching a movie on television,

when she noticed what appeared to be a two-door black car driving

down the alley with its lights off. The car proceeded to the other

side of a telephone pole and then backed in. After the car backed

in, the witness saw two men come away from the car, turn around,

and then face the car, as though they were talking to someone. She

saw nothing in their hands at that time. The taller and thinner of

the two men wore a "bluish-colored coat" with a hood, which he put

up as he was looking around. The two men walked in the direction of

Maude's Pizza.

      The witness called 911 and when the police responded, spoke

with them; the police were in the area for about 5 or 10 minutes.

A "couple minutes" after the police left, she saw the shorter of

the two men walking empty-handed, followed shortly thereafter by

the taller of the two carrying what appeared to be "pieces to

stereos." The taller man opened the door to the passenger side of

the car, moved the bucket seat forward, and put what he was

carrying in the back seat. The taller of the two started the car

and drove into the alley towards Jackson, not turning his lights on

until he reached Jackson where he turned north. At the police

station the witness later identified this vehicle, which was Regina

McNeal's Mustang. The witness never saw a third person leave the

vehicle or walk down the alley. Around the time the two men walked

away from the car, however, the witness looked away to watch

television for a "couple minutes."

     Mary Bearden, who is the mother of defendant's daughter,

testified that shortly after 1 a.m. on April 8, 1994, defendant

came to her apartment and asked her if she would hold some stereo

equipment. When she refused to do so, he left.

     Jimmy Gilmore, who had dated defendant's mother, testified

that "some days" before the defendant was arrested on April 26,

1994, the witness had asked him what had happened and that

defendant had responded, in the words of the witness, "[T]hey drove

there during the time when he was going to pick up his wife and

they went in and something was said or whatever, anyway, they ended

up in the back room or something, and that's when he told me that

he shot the people." At a later time defendant indicated that he

had taken out of Maude's Pizza, Gilmore stated, "some stuff that I

had bought from Woods, and I asked him did it come out of there and

he said yeah." The witness said that a Yamaha receiver was part of

the "merchandise" that he had bought. The defendant indicated

further to the witness that he had covered his face when he had

gone into Maude's Pizza; that James Woods had been present; that

the gun had been "[s]ome inches or so" from the victims when

defendant shot them; that when he shot the victims, they were lying

on the floor and defendant was holding them down with his foot; and

that one of the victims, in the words of the witness, "had tried to

pull up or something like that," as the defendant was shooting him.

Upon cross-examination the witness stated that during the week this

conversation took place he was using cocaine, marijuana, and

alcohol daily, that he considered himself to have been a drug

addict, and that these substances "messed up" his mind.

     A police officer testified that at about 11:29 or 11:30 p.m.

he had received a dispatch of a possible burglary taking place near

Maude's Pizza and that at about 11:32 p.m. he had driven in the

alley behind the apartment building connected to Maude's Pizza. He

walked through the alley all the way to the front of Maude's Pizza,

where he noticed that the lights were on and heard loud music,

circumstances that were not unusual, so he left. He noticed a

Mustang backed into a spot behind an antique shop there and

identified it as the same vehicle portrayed in a photograph of

Regina McNeal's automobile.

     Tyron McNeal testified that on the night in question, when his

wife responded to the doorbell, he recognized the voice of Regina

McNeal. Later that night defendant came to the door, and he and

Regina left together. About three days later Tyron, who was at the

time a deputy in the Lake County sheriff's department, went to

defendant's house to talk to him in an unplanned visit. When Tyron

asked defendant if he had been "involved in that thing down at the

pizza place," defendant "kind of walked away." When Tyron asked

defendant the question again, defendant responded, "Yes." Tyron

testified further that in response to his question, "Why?"

defendant "said something about the guy was a drug dealer and owed

some money." At a later time he spoke to defendant about turning

himself in, but the defendant wanted to do so later, after May 1,

1994.

     Jennifer Giles, 15 years old at the time of trial in January

of 1995, testified that she had been with the defendant on March

28, 1994, at the Pizza House Restaurant in Zion when defendant

fired the handgun in evidence. Michael Zervos, the manager of the

Pizza House Restaurant on that date, testified concerning that

incident, as did the police officer who recovered an empty shell

casing and a fired projectile from the restaurant following the

incident.

     Officer Richards, 16-year-old Sophia Degraffenreid, and her

companion at the time defendant threatened to get a gun from his

apartment, 14-year-old Shammara Evans, testified concerning the

circumstances associated with the recovery of the gun from

defendant's garbage can. A forensic scientist expressed the opinion

that a fired projectile found in the kitchen of Maude's Pizza had

come from the semi-automatic pistol identified as defendant's, as

had the two shell casings found in the vicinity of the bodies, a

fragment of a projectile taken from the body of Gerlach, a fragment

of a projectile taken from the body of Austin, a shell casing

recovered from the Pizza House Restaurant on March 28, 1994, and a

fired 9 millimeter projectile taken from the stairwell wall of

defendant's apartment.

     The defendant contends that his trial lacked the fundamental

fairness implicit in constitutional guarantees of due process of

law because of the State's failure to correct certain testimony of

his wife concerning her plea agreement with the State. During

direct examination of this witness, she testified that conditions

of her plea agreement were that she would not be sent to the

Illinois Department of Corrections, that she could be sentenced to

up to a year in jail for that offense, and that she would testify

truthfully in the instant case. Upon cross-examination the

following colloquy between defense counsel and the witness took

place concerning part of her plea agreement:

               "Q. Wasn't it also part of the agreement that there

          will be no further charges filed against you in the case

          where Perry Austin and Corey Gerlach were killed? Wasn't

          that also part of the agreement?

               A. I never even remembered them physically charging

          me with it.

               Q. I'm not saying that you were ever charged.

               A. Okay.

               Q. I am not saying that at all. But wasn't part of

          the agreement when you pled guilty on May 20th of 1994

          that you would not be charged with anything further in

          relation to this incident, is that correct?

               A. I don't recall that."

When on May 20, 1994, Regina McNeal entered her negotiated plea of

guilty to the charge of unlawful possession of firearm ammunition

by a felon, namely, Aldwin McNeal, based upon a theory of

accountability, she affirmed the trial court's understanding that

as part of the plea agreement the State would not charge her "with

anything else concerning the incident where Perry Austin and Cory

Gerlach were killed."

     Relying on the proposition that the prosecution in a criminal

case is obligated to correct the testimony of its witnesses when it

knows that testimony to be false (see People v. McKinney, 31 Ill.

2d 246 (1964); People v. Lueck, 24 Ill. 2d 554 (1962)), defendant

maintains that a new trial must be ordered because a key component

of Regina McNeal's plea agreement was the State's promise not to

prosecute her for any offense arising out of the incident at

Maude's Pizza, she "denied" this portion of the agreement, and the

State made no attempt to correct this "falsity." He avers that the

jury should have been allowed to judge the credibility of this

"critical" witness with the knowledge that the State had agreed to

forgo prosecution of her completely for any part she might have

played in this incident. He argues that the error was significant

and, citing People v. Jimerson, 166 Ill. 2d 211 (1995), that it was

not harmless.

     In Jimerson we determined that, under the particular facts of

that case, the error could not be considered harmless because the

State failed to prove beyond a reasonable doubt that it did not

contribute to the jury's verdict. Jimerson, 166 Ill. 2d at 228. The

only evidence to link the defendant in Jimerson to the crimes of

which he was convicted was the testimony of Paula Gray, whose

denials of a deal between the prosecutor and herself were deemed

false. Here, by contrast, the testimony of Regina McNeal is not the

only evidence linking the defendant to the offenses committed at

Maude's Pizza. Notably, some of the other evidence consists of

inculpatory statements made by the defendant as well as ballistics

evidence. Furthermore, the testimony of other witnesses

corroborated Regina McNeal's testimony in several important

respects. We assume arguendo that Regina McNeal testified falsely

when she stated that she did not "recall" this condition of her

plea agreement, while we acknowledge the State's argument to the

contrary. However, under these circumstances and in light of the

extensive evidence of defendant's guilt apart from that afforded by

Regina McNeal's testimony, we conclude that the State has proved

beyond a reasonable doubt her uncorrected testimony concerning this

condition of her plea agreement did not contribute to the jury's

verdict and such error was, at most, harmless.

     In the third issue defendant presents for our review, he

maintains that the trial court erred in denying his motion in

limine to exclude as inadmissible certain testimony of Tyron McNeal

on the basis of the clergyman's privilege set forth in the Code of

Civil Procedure (735 ILCS 5/8--803 (West 1994)). Defendant takes

the position that his statements to Tyron, which he sought to

exclude, were made while Tyron was serving in his "professional

character" and in his role as a "spiritual advisor." As a

consequence, defendant urges, the trial court should not have

compelled Tyron to disclose any of defendant's statements to him,

and the error requires a new trial. Section 8--803 of the Code of

Civil Procedure provides:

               "A clergyman or practitioner of any religious

          denomination accredited by the religious body to which he

          or she belongs, shall not be compelled to disclose in any

          court, or to any administrative board or agency, or to

          any public officer, a confession or admission made to him

          or her in his or her professional character or as a

          spiritual advisor in the course of the discipline

          enjoined by the rules or practices of such religious body

          or of the religion which he or she professes, nor be

          compelled to divulge any information which has been

          obtained by him or her in such professional character or

          as such spiritual advisor." 735 ILCS 5/8--803 (West

          1994).

     With respect to the defendant's motion in limine, Tyron McNeal

testified that while he was in the United States Army in Germany,

he became a member of the Church of the Second Coming in 1982 and,

later, a minister in that church. There was no ordination procedure

in this nondenominational Christian church; one became a minister

by receiving one's calling from God and by being confirmed by the

pastor. Tyron has continued to be a minister. In the United States

he has taught Sunday school, was a superintendent of Sunday school

at Mount Zion Baptist Church in Zion, Illinois, and has continued

to be a spiritual advisor. Sometime in 1982 or 1983, while he was

still in Germany, he began to be a spiritual advisor to the

defendant, who turned to Tyron regularly when he needed spiritual

advice. In April of 1994, Tyron testified, defendant turned to him

for guidance and advice. Asked whether this spiritual advice was in

relation to an incident that had happened at Maude's Pizza, the

witness responded, "Yes, some of it." By "some of it," the witness

explained, "Well, it was--some of it was about that, but most of it

was about his relationship with God. That was my main concern was

him getting right with God."

     On cross-examination the witness testified that when he

returned to the United States from Germany, he was no longer a

member of the Church of the Second Coming, since he had moved out

of the area and there was no chapel in Waukegan, and he became a

member of the Mount Zion Baptist Church, of which he was a member

in April 1994. Tyron testified that the first time he had talked to

his brother about the killings at Maude's Pizza, about three days

after they had occurred, he had visited his brother and had

"grabbed" him and asked him if he had been involved in the

killings. When he was talking to him about what had happened at

Maude's Pizza, he asked defendant why he had done it and defendant

had told him that "the guy was a drug dealer," or "something to

that effect," and that he "owed him some money or something like

that." When Tyron had spoken to his brother at a later time, he had

found defendant in Zion and had talked to him about getting him to

turn himself in to the police and about what defendant wanted to do

with regard to the Maude's Pizza case. He testified that he had

chastised defendant at that time about how "stupid what he had done

was, the thing that he did, and how he ha[d] gotten everybody else

involved." Tyron stated that after his brother had been arrested in

this case, Tyron had testified before the Lake County grand jury

about these conversations with defendant in the days following the

murders at Maude's Pizza and had not asserted at that time that he

was acting as a minister in any way on the occasions of these

conversations. The transcript of proceedings before the grand jury

on April 27, 1994, when Tyron McNeal testified before it, was

admitted into evidence with respect to defendant's motion in

limine.

     In ruling on the defendant's motion, the trial court found,

"based on his [Tyron's] word I suppose, that he is a practitioner

of the Church of the Second Coming, although it wasn't established

that that has any presence in the United States other than him. I

will accept that he is a practitioner of that religious

denomination." The court found further that he was "accredited by

it, although I think it's pretty tentative evidence to say the

least on that. I am willing to accept that." The court found as

well that the defendant had met the requirement that disclosure be

enjoined by the rules or practices of the religious body or

religion professed, although the court found that evidence "also

very, very shallow to meet that requirement." However, the trial

court was unable to find that the information here was obtained in

Tyron McNeal's professional character or as a spiritual advisor, as

section 8--803 requires. The trial court discussed some of the

facts it considered in making that finding, among them the fact

that during the first conversation the witness "grabbed the person

[defendant] and asked him if he did it, and that was about the end

of the conversation." Also persuasive to the trial court was the

fact that the witness had disclosed "much, if not all," of these

conversations during the grand jury proceedings "without claiming

the privilege, mentioning the privilege or even putting up a mild

protest about disclosing these things he says his religion prevents

him from disclosing." Of significance to the trial court was the

further fact, contained in the transcript of the grand jury

proceedings, that when the witness asked defendant "why he had shot

those people" at Maude's Pizza, the witness was somewhat uncertain

of defendant's response, stating, " `I don't know. I don't know

what he said. I wasn't even listening. I was too upset. He said

something about the guy owed him money or something. I wasn't even

listening. I was too upset.' "

     The party asserting the privilege must establish all the

elements thereof before it may be successfully invoked. See People

v. Diercks, 88 Ill. App. 3d 1073, 1078 (1980). The finding of the

trial court in this regard will not be disturbed unless it is

against the manifest weight of the evidence. See Diercks, 88 Ill.

App. 3d at 1078. The trial court assessed the evidence pertaining

to each element of the privilege and examined with particular care

that pertaining to the final element. Contrary to defendant's

assertion, its finding that the defendant failed to establish that

his statements were made to Tyron in his professional character or

as a spiritual advisor was plainly not against the manifest weight

of the evidence, and we will not disturb it. Consequently, the

trial court properly denied defendant's motion in limine to exclude

Tyron's testimony concerning defendant's statements to him pursuant

to section 8--803.

     Defendant contends next that he was denied a fair jury verdict

and his constitutional right to effective assistance of counsel

because the verdict forms that were submitted to the jury

concerning each of the three theories of first degree murder as to

each victim set forth some but not all of the elements of that

offense. The six verdict forms returned by the jury state as

follows: (1) "We, the jury, find the defendant, Aldwin McNeal,

Guilty of the offense of first degree murder (was committing the

offense of robbery) of Corey Gerlach"; (2) "We, the jury, find the

defendant, Aldwin McNeal, Guilty of the offense of first degree

murder (knowing his acts created a strong probability of great

bodily harm) of Corey Gerlach"; (3) "We, the jury, find the

defendant, Aldwin McNeal, Guilty of the offense of first degree

murder (intended to kill) of Corey Gerlach"; (4)"We, the jury, find

the defendant, Aldwin McNeal, Guilty of the offense of first degree

murder (was committing the offense of robbery) of Perry Austin";

(5) "We, the jury, find the defendant, Aldwin McNeal, Guilty of the

offense of first degree murder (knowing his acts created a strong

probability of great bodily harm) of Perry Austin"; and (6) "We,

the jury, find the defendant, Aldwin McNeal, Guilty of the offense

of first degree murder (intended to kill) of Perry Austin."

     Defendant argues that these verdict forms are fatally

defective for failing to include "the first proposition for murder,

i.e., `that the defendant, or one for whose conduct he is legally

responsible, performed the acts which caused the death' of each

victim" and for failing to inform the jury that the mental state

must have existed " `when' " the acts were committed. (Emphasis in

original.) Defendant maintains further that defense counsel's

failure to object to these improper verdict forms constituted

ineffective assistance of counsel. He relies principally upon our

opinion in People v. Mack, 167 Ill. 2d 525 (1995), in which the

verdict finding the defendant eligible for the death penalty

attempted to set forth a statutory aggravating factor but failed to

do so completely because it omitted an essential element. In Mack

the verdict stated, " `We, the jury, unanimously find beyond a

reasonable doubt that the following aggravating factor exists in

relation to this Murder: Larry Mack killed Joseph Kolar in the

course of an Armed Robbery.' " Mack, 167 Ill. 2d at 529-30. The

defective verdict in Mack failed to specify that the defendant had

acted with the requisite mental state of intent or knowledge as

required under section 9--1(b)(6) of the Criminal Code of 1961

(Ill. Rev. Stat. 1979, ch. 38, par. 9--1(b)(6)).

     As we stated in Mack, the test of the sufficiency of a verdict

is whether the intention of the jury can be ascertained with

reasonable certainty from the language used. Mack, 167 Ill. 2d at

537. In determining the meaning of a verdict, all parts of the

record will be searched and interpreted together. Mack, 167 Ill. 2d

at 537. A verdict should have a reasonable intendment and receive

a reasonable construction; it should not be set aside unless from

necessity originating in doubt as to its meaning, or because of the

immateriality of the issues found, or because of a failure to find

upon a material issue involved. Mack, 167 Ill. 2d at 537. Where a

verdict purports to set out the elements of the offense as specific

findings, it must do so completely or be held insufficient, and a

verdict that finds the accused guilty of only a certain part of an

offense amounts to an acquittal of the residue. Mack, 167 Ill. 2d

at 537-38. However, it is well established that a general verdict

of "guilty in manner and form as charged in the indictment" or

simply "guilty" is sufficient to sustain a conviction, as is a

verdict identifying the offense by name. Mack, 167 Ill. 2d at 538.

     In the instant case each of the verdicts in question

identifies the offense of which the defendant is found guilty by

name: first degree murder. The jury was instructed that

          "[a] person commits the offense of first degree murder

          when he kills an individual, if, in performing the acts

          which cause the death,

                    he intends to kill that individual; or he

               knows that such acts create a strong probability of

               great bodily harm to that individual; or he is

               committing the offense of robbery."

The jury was also instructed concerning the two propositions that

the State must prove to sustain the charge of first degree murder,

including, as the first, "[t]hat the defendant, or one for whose

conduct he is legally responsible, performed the acts which caused

the death" of each named victim and, as the second proposition,

"[t]hat when the defendant, or one for whose conduct he is legally

responsible, did so, he intended to kill" each named victim; "or he

knew that his acts created a strong probability of great bodily

harm to" each named victim; "or he was committing the offense of

robbery." The trial court instructed the jury further that "[t]he

defendant is charged in different ways with the offense of first

degree murder ***."

      Whereas in Mack there was a discrepancy that might have

confused jurors between the verdict form and other instructions, no

discrepancy exists here. The parenthetical material on each of the

six verdict forms refers to one of three different ways in which

the defendant was charged with the offense of first degree murder

as to each of the two victims, ways that are explained in other

instructions to the jury in conformity with the phrases in

parentheses on the verdict forms. Were this parenthetical material

to be deemed a finding by the jury as to but a single element of

the offense or a finding of guilt as to only a part of it, the

jury's finding concerning defendant's guilt of the named offense of

first degree murder would be rendered surplusage, an unreasonable,

even absurd, construction. The meaning of the verdict and the

intention of the jury is as plain as the language of each verdict

finding him guilty of the offense of first degree murder. Thus, the

challenged verdict forms were neither insufficient nor improper.

That being so, defendant was denied neither a fair jury verdict nor

the effective assistance of counsel as a consequence of counsel's

failure to object to the verdict forms.

     In the fifth issue defendant raises for review, he contends

that a new sentencing hearing is warranted because repeated remarks

of the prosecutors to the jury that defendant would kill in prison

if given any sentence other than death were improper, particularly

where there was no evidentiary basis for such argument. The first

of the three remarks about which defendant complains is this

request of the prosecutor: "I ask you not to put him in our prison

system and keep him in our prison system to be violent." The latter

two were made during the State's closing argument in rebuttal:

          "And I suppose it would be something else if you could

          insure yourselves that he wouldn't do this again. But he

          is not sorry and you can't assure yourselves that he

          won't do this again, even in prison. Not only can you not

          assure yourselves that he won't do it again, but the

          evidence that you have received, which is what you are

          supposed to consider here, indicates the otherwise

          [sic]."

               "And how any person here can think that we are not

          unleashing a hellion to the Department of Corrections

          forever, I don't know. ***

               *** He is in prison for life. There isn't any good

          time to take away from him. Now he has killed two people

          since the last time he has been in prison. He has had the

          opportunity and the experience of watching people squirm

          when shotguns were put in their mouths and guns put to

          their heads with the fingers on the trigger clicking

          away, those people not knowing if they are about to have

          a projectile rip through their skulls like Perry Austin

          did and Corey Gerlach. That man is in prison.

               That man perhaps is going to have a shiv [a knife]

          again, like we know he did have that one occasion. Maybe

          there will be a dispute. Is there a person here who can't

          say that he would hesitate to kill? I don't know how you

          could."

     Although the defendant made no objection to any of these

comments when they were made, he did raise the issue of their

impropriety in his post-trial motion. In denying that motion, the

trial court made four findings concerning this issue: (1) that

there was no objection; (2) that there was evidence to support

"some argument as far as future violent conduct of killing or acts

that endanger people's lives"; (3) that in the course of these

arguments the prosecutors did say that they were making the

arguments on the basis of inferences drawn from the evidence; and

(4) that even if the State's argument were improper or based

insufficiently upon the evidence, it would not have caused the jury

to make its decision on anything other than the evidence.

     Although defendant avers that this issue is preserved for

review by virtue of his "very specific and lengthy post-trial

motion and arguments relative to this claim," the State asserts

correctly that defendant's failure to raise contemporaneous

objections to these remarks constitutes a waiver of the issue on

appeal. See People v. Herrett, 137 Ill. 2d 195, 209 (1990).

Defendant points out that at the hearing on his post-trial motion

each of defendant's attorneys indicated that the failure to make a

contemporaneous objection was an oversight and stated unequivocally

that it was not a matter of strategy. In the alternative, defendant

asks this court to review the question under the doctrine of plain

error, pursuant to Supreme Court Rule 615(a) (134 Ill. 2d R.

615(a)), which allows a court of review to consider an alleged

error that has not been preserved properly for review where the

evidence is closely balanced or where the error is so fundamental

and of such magnitude that the accused was denied a fair trial.

People v. Edgeston, 157 Ill. 2d 201, 239-40 (1993). Where it is

necessary to preserve the integrity of the judicial process and to

insure a fair hearing, the plain error rule is applicable. People

v. Pitsonbarger, 142 Ill. 2d 353, 402 (1990). Although our review

discloses that application of the rule is unwarranted, we elect to

consider the merits of defendant's claim concerning these alleged

prosecutorial improprieties.

     In closing argument parties may not go beyond the scope of the

evidence presented and facts fairly inferable therefrom. People v.

Holman, 103 Ill. 2d 133, 163 (1984). In the absence of supporting

evidence, a prosecutor may not speculate before a sentencing jury

that a defendant may commit future crimes if he is not sentenced to

death. People v. Hudson, 157 Ill. 2d 401, 457 (1993). Speculating

on the possibility that the defendant might commit future crimes if

he is not executed may cause the jury to focus upon a possibility

that may or may not occur and is immaterial to the jury's

consideration of aggravating and mitigating factors. Pitsonbarger,

142 Ill. 2d at 401. However, each instance of error of this kind

must be examined with respect to the facts of the case and in the

context of the closing argument as a whole. Edgeston, 157 Ill. 2d

at 241.

     At the outset, we observe that the first of the remarks

defendant finds objectionable was made following the prosecutor's

comment upon the testimony of Dr. Lawrence Heinrich, a clinical

psychologist who had examined defendant and whom defendant had

called to present evidence in mitigation. Dr. Heinrich testified,

among other things, that he had diagnosed the defendant as having

antisocial personality disorder, which he describes as "what we

commonly characterize as the criminal-type personality, one that

seems to lack conscience, that seems to take advantage of other

people, that in this possibly even being aggressive, sadistic--it's

basically characterized by longstanding conflicts with the law from

the time of adolescence throughout adulthood, and that's certainly

true in Mr. McNeal's case." On cross-examination Dr. Heinrich

indicated that a description of antisocial personality disorder

includes the adjectives "mean" and "violent." Dr. Heinrich

testified at length concerning the report of a test he had given

defendant, the Millon Clinical Multi Axial Inventory, and stated,

inter alia, that he thinks defendant is "brutal" toward other

people and that defendant can be "dangerous," "[e]ven in an

institutional setting." During closing argument the prosecutor

referred expressly, and properly, to this testimony of the

defendant's expert witness in making the first of these three

remarks:

          "And the doctor himself told you that he can even be

          violent in prison.

               I ask you not to put him in our prison system and

          keep him in our prison system to be violent."

     During the course of closing argument, the State ranged

broadly over the wealth of evidence amassed in aggravation against

the defendant, stressing the evidence of his criminal past, his

history of sadistic and increasingly violent behavior, his lack of

remorse, and his attitude and conduct while incarcerated. We need

not set forth in detail all of the evidence adduced in aggravation

and mitigation. It is sufficient to say that the evidence

marshalled against the defendant in aggravation far outweighed that

which he presented in mitigation. With respect to the latter two

comments, to the extent that the prosecution overstated the

evidence or drew from it inferences so expansive that they amounted

to speculation, its argument was improper. However, in light of the

evidence, any such excess on the part of the State was relatively

slight, in part because of Dr. Heinrich's testimony bearing upon

defendant's future dangerousness in prison. Under the circumstances

here the two remarks could not have diverted the attention of the

jury from considering the aggravating and mitigating factors

presented by the case, the character and record of the defendant,

or the nature and circumstances of his offense. See Holman, 103

Ill. 2d at 164. Considering these two comments in the context of

the closing argument in its entirety and all of the evidence

adduced in aggravation and mitigation, we conclude that the State

has proved beyond a reasonable doubt that the error complained of

did not contribute to the verdict and was, thus, harmless. See

Satterwhite v. Texas, 486 U.S. 249, 256, 100 L. Ed. 2d 284, 293,

108 S. Ct. 1792, 1797 (1988).

     As his sixth contention of error, defendant maintains that the

death penalty statute in Illinois violates the eighth and

fourteenth amendments by placing a burden of proof on the defendant

that precludes meaningful consideration of evidence in mitigation.

Defendant puts forth essentially the same arguments advanced

unsuccessfully by the defendant in People v. Hampton, 149 Ill. 2d

71 (1992), in which this court pointed out it has held repeatedly

that the death penalty statute does not impose a constitutionally

impermissible burden upon a defendant. We decline to revisit the

issue.

     Similarly, by way of his seventh contention of error,

defendant challenges the constitutionality of the death penalty

statute in Illinois as violative of the eighth and fourteenth

amendments for failing to minimize sufficiently the risk of

arbitrarily or capriciously imposed sentences of death. He

acknowledges that this court has considered individually several

issues he sets forth in this regard but asks us not only to

reconsider these claims but also to consider whether in their

totality the features and omissions he cites render the statute

unconstitutional. In the absence of any persuasive argument to

consider anew the individual constitutional defects he identifies,

we decline to do so. Likewise, this court has previously rejected

the argument that the cumulative effect of such features and

omissions renders the statute constitutionally infirm (People v.

Phillips, 127 Ill. 2d 499, 542-43 (1989)), and defendant presents

nothing new that persuades us to reconsider this conclusion.

     In a supplemental brief defendant contends that it was eighth

amendment error, requiring a new sentencing hearing, for the

prosecutor to argue in closing at the aggravation and mitigation

phase of his hearing that his antisocial personality disorder

constituted evidence in aggravation. The precise comments to which

defendant objects are these:

          "And what is antisocial personality disorder? It's just

          being mean and violent is what it comes down to, and he

          told you that.

               Basically what it comes down to is the person we

          have here, the doctors can put it into fancy words, the

          fancy words being antisocial personality disorder or

          whatever else they want to pick out of their book, but

          the bottom line is the character of this man, his

          meanness, his violence, his sadism. That's not a

          mitigating factor. That's an aggravating factor. It's not

          a mitigating factor that he has an antisocial personality

          disorder. It's an aggravating factor. It shows you how

          violent he can be. And the doctor himself told you that

          he can even be violent in prison."

Defendant describes as his "most important" evidence in mitigation

Dr. Heinrich's testimony that he suffered from the statutory

mitigating factor of an "extreme mental or emotional disturbance"

(720 ILCS 5/9--1(c)(2) (West 1994)), a primary component of which

was his antisocial personality disorder. He maintains that his

"mental illness" cannot be considered as aggravation because it did

not develop as a consequence of any fault on his part and he cannot

be blamed for that which is beyond his control. In short, he

argues, his "mental illness cannot be used to justify his

execution."

     In order to meet constitutional standards, a capital

sentencing hearing must permit individualized consideration of the

offender and the offense. Hudson, 157 Ill. 2d at 454. In accord

with that requirement, the sentencer in a capital case may not be

precluded from considering, or refuse to consider as a matter of

law, any relevant mitigating evidence offered by the defense.

Hudson, 157 Ill. 2d at 454; People v. Page, 155 Ill. 2d 232, 279

(1993). Allowing the sentencer to consider all relevant mitigating

evidence satisfies the requirement of individualized sentencing in

capital cases. Page, 155 Ill. 2d at 279.

     However, these requirements do not oblige a prosecutor to

agree with the defendant that evidence offered in his behalf is

sufficiently mitigating to preclude imposition of the death penalty

or that it is even mitigating at all. Hudson, 157 Ill. 2d at 454.

Nor is it improper for a sentencer to consider a defendant's

evidence presented in mitigation as a factor in aggravation.

Hudson, 157 Ill. 2d at 455. Just as the sentencer may determine the

weight to be given relevant mitigating evidence, the prosecutor may

contest during the sentencing hearing the significance or weight of

the defendant's evidence presented in mitigation and disagree with

a defendant's assessment of the nature and character of it. See

Page, 155 Ill. 2d at 279-80.

     We find particularly instructive People v. Henderson, 142 Ill.

2d 258 (1990), in which the defendant argued that the trial court

wrongly judged the significance of evidence of his traumatic

childhood and turbulent family history and that, to a substantial

extent, he was the "involuntary product" of an extremely violent

and dysfunctional family environment, involuntary because he had

chosen neither his relatives nor his upbringing. This court in

Henderson pointed out that, contrary to the assertions of the

defendant, the Supreme Court has indicated that evidence of an

upbringing that has caused a defendant to become violent and

aggressive can be considered in aggravation, for one duty of a

sentencer is to predict a defendant's future behavior based upon

his past behavior. Henderson, 142 Ill. 2d at 339, citing Skipper v.

South Carolina, 476 U.S. 1, 5, 90 L. Ed. 2d 1, 7, 106 S. Ct. 1669,

1671 (1986). Inasmuch as a defendant's upbringing is no more within

his control than is an antisocial personality disorder, it is not

unreasonable to conclude that it too may be considered in

aggravation.

     Also in Henderson this court considered Penry v. Lynaugh, 492

U.S. 302, 328, 106 L. Ed. 2d 256, 284, 109 S. Ct. 2934, 2951-52

(1989), in which the trial court erred by failing to instruct the

jury that it could consider and give effect to the mitigating

evidence of defendant's mental retardation and abused background.

There was evidence in Lynaugh that the defendant's mother had

beaten him about the head with a belt as a child and that he was

moderately retarded and unable to learn from experience. Penry, 492

U.S. at 308-09, 106 L. Ed. 2d at 271-72, 109 S. Ct. at 2941. The

Supreme Court recognized that "Penry's mental retardation and

history of abuse is thus a two-edged sword: it may diminish his

blameworthiness for his crime even as it indicates that there is a

probability that he will be dangerous in the future." Penry, 492

U.S. at 324, 106 L. Ed. 2d at 281, 109 S. Ct. at 2949. As we noted

in Henderson, the Court in Penry stated neither that this evidence

was inherently mitigating and the sentencer was required to

consider it as such nor that it would be improper to consider this

evidence in aggravation as it indicated that the defendant had a

violent nature not amenable to rehabilitation. Henderson, 142 Ill.

2d at 340. We think that by analogy the same conclusion can be

reached here and that defendant's antisocial personality disorder

is, likewise, a double-edged sword for purposes of mitigation and

aggravation.

     Further, as this court stated in People v. Coleman, 168 Ill.

2d 509, 537 (1995), while evidence of any mental or emotional

problems that afflict a capital defendant are critically important

to the sentencing decision, not every mental or emotional condition

that can be classified as a "disorder" will necessarily be

mitigating. In Coleman the affidavit of a clinical psychologist

submitted in support of the defendant's post-conviction petition

indicated that the defendant had developed characteristics of

personality likely to be viewed as aggravating rather than

mitigating, specifically, a lack of empathy and lack of guilt or

anxiety attached to illegal or antisocial behaviors; in Coleman we

concluded that it was not clear the expert testimony would have

produced a profile that the jury would have viewed in an entirely

sympathetic light. Coleman, 168 Ill. 2d at 537-38.

     In the instant case, the State's characterization of

defendant's evidence of antisocial disorder as aggravating rather

than mitigating in no way restricted the jury's individualized

consideration of the defendant and the offenses he had committed.

The State's argument neither limited the defendant's presentation

of any of his evidence in mitigation nor precluded the jury's

consideration of it. At no time did the State suggest to the jury

that the law did not allow it to consider this evidence in

mitigation (see People v. Bean, 137 Ill. 2d 65, 126 (1990)), and

defendant makes no claim that the jury was not properly instructed

by the trial court concerning consideration of it. Referring to

details of Dr. Heinrich's testimony, the prosecutor merely

disagreed with the defendant's characterization of that evidence as

mitigation, as he is permitted to do. The jury as sentencer was

allowed to consider all relevant mitigating evidence the defendant

presented so that the requirement of individualized sentencing was

satisfied. Hence, the prosecutor's characterization of defendant's

antisocial personality disorder as a factor in aggravation did not

deprive defendant of a fair and reliable sentencing hearing and

occasioned no eighth amendment error.

     Therefore, for the reasons stated above, we affirm the

judgment of the circuit court of Lake County. We hereby direct the

clerk of this court to enter an order setting Wednesday, May 14,

1997, as the date on which the sentence of death entered by the

circuit court of Lake County is to be carried out. The defendant

shall be executed in a manner provided by law (725 ILCS 5/119--5

(West 1994)). The clerk of this court shall send a certified copy

of the mandate in this case to the Director of Corrections, to the

warden of Stateville Correctional Center, and to the warden of the

institution where defendant is now confined.

 Affirmed.